IRVING, P.J.,
for the Court:
¶ 1. This case involves a custody dispute between William and Sarah Smith, the grandparents of Jason Wells, and Tara Wells, Jason’s natural mother.[1] On June 2, 2008, the Smiths filed a petition in the Tippah County Chancery Court for tempo *89 rary and permanent custody of Jason. On October 1, 2008, they filed a petition for adoption and termination of the parental rights of Tara and Robert Johnson, Jason’s natural father.[2] The chancery court declined to terminate Tara and Robert’s parental rights. However, the court found that Jason’s best interest would be served by granting the Smiths primary custody of Jason. Tara was granted visitation rights. The chancery court relied on the doctrine of in loco parentis in rendering its judgment. Tara’s sole issue on appeal is that the chancery court erred in relying on the doctrine of in loco parentis to grant custody to the Smiths.
¶ 2. Based on the recent Mississippi Supreme Court case of Vaughn v. Davis, 36 So.3d 1261 (Miss.2010), we find that the chancery court’s judgment must be reversed and this case remanded for further proceedings.
FACTS
¶ 3. Jason was born on June 14, 2003. Sarah is Jason’s maternal grandmother; William is related to Jason only by marriage. After Jason was born, he and Tara lived with the Smiths while Tara attended college. Tara sometimes visited Jason during the weekends while she attended college. Tara attended school for approximately the first three years after Jason was born. According to the Smiths, Tara’s visits with Jason became less frequent the longer she was in school. In April 2006, Robert and Tara were married. Robert was in the military and was stationed near Washington D.C.; Tara moved to Washington D.C. shortly after the marriage, and Jason went to live with Tara in Washington D.C. approximately a month later. In June 2006, after being married for less than three months, Tara and Robert separated. Not long after his arrival in Washington D.C., Jason returned to Mississippi. Jason spent time in both Washington D.C. and Mississippi until November 2006, when he permanently returned to Mississippi. Jason lived with Robert’s parents for some of his time in Mississippi in 2006, although he eventually moved in permanently with the Smiths. Around the same time, Tara lost her job in Washington D.C.
¶ 4. Tara worked a number of different jobs beginning in 2007. Jason remained in Mississippi, and Tara visited him here sporadically. According to William, he offered to pay for Tara to move back to Mississippi, but she refused. In April or May 2007, Tara gave the Smiths medical guardianship over Jason. According to Cindy. Howell, Tara’s sister, Cindy once planned a birthday party for Jason that Tara was supposed to attend, but Tara spent her time in Jackson, Mississippi, with a boyfriend instead of visiting Jason.
¶ 5. From January 2008 to June 2008, Tara’s visits with Jason became more infrequent. From February 2008 to March 2009, Tara worked for a company called Soft Edge. She indicated that she made enough money at this job to support herself; regardless, she made no attempt to live with Jason during her employment. In December 2008, Tara moved in with another man, Neil Baker. In March 2009, Tara and Baker moved to Arizona. Tara and Baker became engaged, despite Tara’s inability to locate Robert, to whom she was still married. In April 2009, the chancery court appointed a guardian ad litem (GAL) to represent Jason’s interest; at the time of the GAL’s report, Tara was dependent on Baker for financial support. At that time, Baker had never met Jason.
¶ 6. Jason’s school teachers testified that the only mother or father that Jason had ever mentioned were the Smiths. In De *90 cember 2008, Robert joined in the Smiths’ petition for custody of Jason and consented to the Smiths’ continued custody of Jason. Robert also consented to and joined in the Smiths’ petition to adopt Jason.
¶ 7. The GAL recommended to the court that Jason’s best interest would be served by remaining in the custody of the Smiths. In his report, the GAL noted: “While it is undisputed that [Tara] loves her son, the facts clearly establish that she has done little to insure his welfare, other than leaving him with [William] and [Sarah].” The chancery court relied on the doctrine of in loco parentis, largely on the GAL’s recommendation, to overcome the natural-parent presumption and find, under the Albright factors,[3] that Jason’s best interest would be served by letting the Smiths retain custody of Jason. In so finding, the chancery court noted that the Smiths’ home is essentially the only home that Jason has ever known.
¶ 8. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUE
¶ 9. Tara contends that the chancery court erred in relying on the doctrine of in loco parentis to overcome the natural-parent presumption. We have been unable to find any case law to support the notion that the doctrine may be used to overcome the natural-parent presumption. Therefore, the chancellor should not have relied on this doctrine to overcome the presumption.
¶ 10. However, there is a recent Mississippi Supreme Court case that is analogous to the situation before this Court. In Vaughn, the minor child, Danielle, was born out of wedlock in October 2000. Vaughn, 36 So.3d at 1262 (¶ 2). Danielle and her mother, Theresa, lived with Connie Davis, Theresa’s mother, after Danielle’s birth. Id. Theresa was killed in a 2002 car accident. Id. After Theresa’s death, Connie and William Vaughn, Danielle’s natural father, agreed that Connie should keep Danielle for the immediate future. Id. Vaughn rarely visited Danielle and failed to pay child support. Id. Vaughn did not seek custody of Danielle. Id. In 2004, Vaughn agreed to grant Connie temporary custody of Danielle. Id. at (¶ 3). Even after legal proceedings were started regarding Danielle’s custody, Vaughn continued to visit Danielle only sporadically. Id. at 1263 (¶ 5). When Vaughn obtained a life-insurance policy, he named only his new wife as the beneficiary. Id. The chancery court relied on Vaughn’s agreement to the temporary custody order to find that he had relinquished his right to the natural-parent presumption. Id. at 1264 (¶ 8). The chancery court then found, under Albright, that Connie should have custody of Danielle. Id.
¶ 11. The supreme court found that the chancery court should not have used Vaughn’s agreement to the temporary custody order to find that he had relinquished his parental rights. Id. The supreme court noted that the primary determination in every custody case should be what is in the best interest of the child at the heart of the case. Id. at (¶ 10). The supreme court noted that:
The chancellor believed he had only two options. He would have to find Vaughn immoral or unfit as a parent, or that he had abandoned the child, and then do an Albright analysis to determine Danielle’s best interest.... Or, if he failed to find *91 immorality, unfitness, or abandonment, he would have to grant custody to Vaughn without regard to Danielle’s best interest.... The chancellor found abandonment through Vaughn’s temporary agreement to temporary custody. Following this finding, the chancellor determined that Danielle’s best interest ... [was] served by continuing to live in Connie’s home, the only home Danielle had ever known.
We find that the chancellor was not required to make such a stark choice under these facts. Our custody statute ... offers another option, a finding of desertion.... Thus, the chancellor could have treated Vaughn’s inaction prior to the agreed order as desertion of Danielle. If so, Vaughn would have forfeited the presumption he had as her natural father, even though his actions/inactions do not compare to the behavior our courts have found to constitute abandonment or constructive abandonment.
[[Image here]]
In [In re Dissolution of Marriage of] Leverock [and Hamby, 23 So.3d 424 (Miss.2009) ], this Court found that a father had deserted his son by “completely avoiding both his moral and legal duties and obligations as a father for more than two years. During this period of time, he showed a complete disregard for the welfare of his young son.” The Leverock Court continued that the father had chosen “to take an extended holiday from the responsibilities of par-enthoodf,]” and we find that he should not now be able to claim the benefit of his status as a natural parent.
Id. at 1264-65 (¶¶ 11-14) (citations omitted). The Vaughn court then reversed and remanded the case to the chancery court for a determination of whether “Vaughn had relinquished the natural-parent presumption for reasons other than forfeiture by agreeing to a temporary custody order.” Id. at 1267 (¶ 18). The court also noted that years had passed since the initial order and that the “chancellor should consider Danielle’s circumstances at the time of the remand hearing, if he determines that desertion has been proven. As always in custody matters, the best interest ... of the child should guide the analysis as a polestar.” Id.
¶ 12. Although Vaughn was a case where the chancery court improperly found relinquishment of the natural-parent presumption due to the signing of a temporary custody order, it is analogous to this case. Here, the chancellor improperly relied on the doctrine of in loco parentis to find that the natural-parent presumption had been relinquished. We have been able to find no precedent for using that doctrine to overcome the natural-parent presumption. However, given the similarity of the facts in this case to Leverock and Vaughn, this case should be remanded to the chancery court to determine whether Tara deserted Jason, thus relinquishing her right to the natural-parent presumption. On remand, the chancery court should consider Jason’s circumstances at the time of remand.
¶ 13. THE JUDGMENT OF THE TIPPAH COUNTY CHANCERY COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEES.
LEE, C.J., MYERS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. GRIFFIS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. RUSSELL, J., NOT PARTICIPATING.

. All of the parties have been given fictitious names in order to protect the privacy of the minor child.

. Robert was allegedly incarcerated in Virginia at the time of the petition.

. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983).