ON WRIT OF CERTIORARI

WALLER, Chief Justice, for the Court:
¶ 1. William and Sarah Smith are the grandparents of Jason Wells. Jason’s mother, Tara Wells, is Sarah’s daughter.[1] The Smiths filed a petition for temporary and permanent custody of Jason. They later filed a separate petition for adoption and to terminate the parental rights of Tara and Robert Johnson, the biological father. The chancellor declined to terminate Tara’s and Robert’s parental rights but awarded the Smiths primary custody of Jason. In awarding the Smiths custody, the chancellor found that Tara had “by her long and continuous absences from [Jason] failed to exercise her parental rights and fulfill her parental responsibilities.” He found that this had caused the Smiths to assume the role of parents to Jason for virtually his entire life and that the Smiths thus stood in loco parentis. The chancellor then conducted a best-interest, Al-bright [2] analysis and concluded that Jason should remain with the Smiths.
¶ 2. Under Mississippi law, a natural parent loses the legal presumption that custody should be with him or her only if there has been a clear showing of abandonment, desertion, or unfitness on the part of the parent. See infra ¶¶ 8-9. The Albright factors are not considered unless such showing has first been made. Id. Since the chancellor here proceeded to conduct an Albright analysis, he treated the natural-parent presumption as though it had been overcome; thus, he implicitly and necessarily found that it had been. We must decide whether he did so based on the doctrine of in loco parentis — which would be error — or based on a finding of desertion by Tara, which, in turn, had necessitated the Smiths standing as in loco parentis for Jason. We find the latter; *45 therefore, we affirm the judgment of the chancery court.
FACTS
¶ 3. The Court of Appeals set out the facts and procedural background as follows:
Jason was born on June 14, 2003. Sarah is Jason’s maternal grandmother; William is related to Jason only by marriage. After Jason was born, he and Tara lived with the Smiths while Tara attended college. Tara sometimes visited Jason during the weekends while she attended college. Tara attended school for approximately the first three years after Jason was born. According to the Smiths, Tara’s visits with Jason became less frequent the longer she was in school. In April 2006, Robert and Tara were married. Robert was in the military and was stationed near Washington D.C.; Tara moved to Washington D.C. shortly after the marriage, and Jason went to live with Tara in Washington D.C. approximately a month later. In June 2006, after being married for less than three months, Tara and Robert separated. Not long after his arrival in Washington D.C., Jason returned to Mississippi. Jason spent time in both Washington D.C. and Mississippi until November 2006, when he permanently returned to Mississippi. Jason lived with Robei't’s parents for some of his time in Mississippi in 2006, although he eventually moved in permanently with the Smiths. Around the same time, Tara lost her job in Washington D.C. Tara worked a number of different jobs beginning in 2007. Jason remained in Mississippi, and Tara visited him here sporadically. According to William, he offered to pay for Tara to move back to Mississippi, but she refused. In April or May 2007, Tara gave the Smiths medical guardianship over Jason. According to Cindy Howell, Tara’s sister, Cindy once planned a birthday party for Jason that Tara was supposed to attend, but Tara spent her time in Jackson, Mississippi, with a boyfriend instead of visiting Jason.
From January 2008 to June 2008, Tara’s visits with Jason became more infrequent. From February 2008 to March 2009, Tara worked for a company called Soft Edge. She indicated that she made enough money at this job to support herself; regardless, she made no attempt to live with Jason during her employment. In December 2008, Tara moved in with another man, Neil Baker. In March 2009, Tara and Baker moved to Arizona. Tara and Baker became engaged, despite Tara’s inability to locate Robert, to whom she was still married. In April 2009, the chancery court appointed a guardian ad litem (GAL) to represent Jason’s interest; at the time of the GAL’s report, Tara was dependent on Baker for financial support. At that time, Baker had never met Jason.
Jason’s school teachers testified that the only mother or father that Jason had ever mentioned were the Smiths. In December 2008, Robert joined in the Smiths’ petition for custody of Jason and consented to the Smiths’ continued custody of Jason. Robert also consented to and joined in the Smiths’ petition to adopt Jason.
The GAL recommended to the court that Jason’s best interest would be served by remaining in the custody of the Smiths. In his report, the GAL noted: “While it is undisputed that [Tara] loves her son, the facts clearly establish that she has done little to insure his welfare, other than leaving him with [William] and [Sarah].”
*46 Smith ex rel. Adoption of Wells v. Smith, 97 So.3d 88, 90 (Miss.Ct.App. May 31, 2011).
¶ 4. The chancery court found that Tara had “failed to exercise her parental rights and fulfill her parental responsibilities” by her “long and continuous absences” from Jason. Consequently, the Smiths had raised Jason virtually his entire life and therefore stood in the position of in loco parentis. The chancery court then proceeded to conduct an analysis based on the Albright factors to determine custody. It concluded that Jason’s best interest was served by allowing the Smiths to retain custody.
¶ 5. Tara appealed to this Court, and we assigned the case to the Court of Appeals. She argued that the chancery court had erroneously relied upon the Smiths’ status as in loco parentis to find that Tara’s right to the natural-parent presumption had been relinquished. The Court of Appeals agreed. Smith ex rel. Adoption of Wells v. Smith, 97 So.3d 88, 90-91. It reversed and remanded the case for the chancery court to determine instead whether Tara had relinquished her right to the natural-parent presumption by deserting Jason. Id.
¶ 6. The Smiths now file this petition for writ of certiorari. They argue that the chancery court did find that Tara had deserted Jason and that it had used desertion — not the doctrine of in loco paren-tis — as the basis for its finding that Tara had relinquished the natural-parent presumption. Alternatively, the Smiths assert that their standing as in loco parentis should overcome the natural-parent presumption in favor of Tara. We granted certiorari to address these issues.
DISCUSSION
¶ 7. A chancellor’s custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard. E.g., Johnson v. Gray, 859 So.2d 1006, 1012 (Miss.2003) (citing Mabus v. Mabus, 847 So.2d 815, 818 (Miss.2003)).
¶ 8. The best interest of the child is paramount in any child-custody case. E.g., Sellers v. Sellers, 638 So.2d 481, 485 (Miss.1994) (citing Smith v. Todd, 464 So.2d 1155 (Miss.1985)). In custody battles between a natural parent and a third party, it is presumed that it is in the child’s best interest to remain with his or her natural parent. Carter v. Taylor, 611 So.2d 874, 876 (Miss.1992) (quoting Rodgers v. Rodgers, 274 So.2d 671, 672 (Miss.1973)). To be awarded custody, therefore, the third party must first clearly rebut the natural-parent presumption or preference; if it is successfully rebutted, the chancellor must then examine the Albright factors and determine that third-party custody serves the best interest of the child. Logan v. Logan, 730 So.2d 1124, 1127 (Miss.1998); see also In re Custody of M.A.G., 859 So.2d 1001, 1004 (Miss.2003) (stating that “a finding of unfitness is necessary to award custody to a third party against a natural parent and must be done before any analysis using the Albright factors”).
¶ 9. The natural-parent presumption can be rebutted by a clear showing that (1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent’s conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody. Carter, 611 So.2d at 876 (quoting Rodgers, 274 So.2d at 672); Vaughn v. Davis, 36 So.3d 1261, 1264-65 (Miss.2010); In re Dissolution of Marriage of Leverock and Hamby, 23 So.3d 424, 429-30 (Miss.2009).
¶ 10. The doctrine of in loco par-entis does not, by itself, overcome the *47 natural-parent presumption. The term in loco parentis means “in the place of a parent.” Farve v. Medders, 241 Miss. 75, 81, 128 So.2d 877, 879 (1961). It “ ‘exists when [one] person undertakes care and control of another in absence of such supervision by [the] latter’s natural parents and in absence of formal legal approval, and is temporary in character and is not to be likened to an adoption which is permanent.’ ” J.P.M. v. T.D.M., 932 So.2d 760, 780 (Miss.2006) (quoting Black’s Law Dictionary 787 (6th ed. 1990)) (Cobb, P.J., specially concurring); see also J.P.M., 932 So.2d at 769 n. 6 (Miss.2006) (quoting Griffith v. Pell, 881 So.2d 184, 186 n. 1 (Miss.2004)) (defining in loco parentis as “ ‘[a]ny person who takes a child of another into his home and treats it as a member of his family, providing parental supervision, support and education, as if it were his own child ... ’ ”).
¶ 11. In loco parentis can — in very limited, unique situations — sometimes be used to help rebut the natural-parent presumption. In both Pell and J.P.M, a husband learned during the pendency of divorce
proceedings that he was not the biological father of a child born of, or just prior to, the marriage. J.P.M., ,932 So.2d at 762-65; Pell, 881 So.2d at 185. In those cases, we reasoned that the natural-parent presumption had been overcome[3] based on several facts: (1) the husbands stood in loco par-entis; (2) they had supported, cared for, and treated the child as their own; (3) they could have been required to pay child support (“[w]ith the burden should go the benefit”); and (4) the biological fathers were not really in the picture: the one in Pell had disclaimed any interest in the child and had agreed to relinquish his parental rights, while the one in J.P.M. could not even be determined conclusively.[4] Pell, 881 So.2d at 186-87; J.P.M., 932 So.2d at 767-70. Though in loco parentis was considered in Pell and J.P.M., those cases do not support — nor have we ever suggested — that in loco parentis alone can rebut the natural-parent presumption.
¶ 12. Turning to the facts before us, we have held that grandparents who stand in loco parentis have no right to the *48 custody of a grandchild, as against a natural parent, unless the natural-parent presumption is first overcome by a showing of abandonment, desertion, detrimental immorality, or unfitness on the part of the natural parent. See Ethredge v. Yawn, 605 So.2d 761, 764, 766 (Miss.1992) (citations omitted). Thus, the Smiths’ standing as in loco parentis is insufficient to overcome the natural-parent presumption.
¶ 13. Having found that in loco parentis is insufficient to overcome the natural-parent presumption, we consider the chancellor’s order. The Smiths insist that the chancellor actually relied on Tara’s desertion of Jason — not the Smiths’ standing as in loco parentis — to find that Tara had relinquished the natural-parent presumption.
¶ 14. The chancellor’s order stated, in pertinent part, that:
[T]he Court finds that [Tara] has by her long and continuous absences from [Jason] failed to exercise her parental rights and fulfill her parental responsibilities, which has necessitated [the Smiths] to assume the role of parents to [Jason], who has been raised by [the Smiths] for virtually his entire life, it is
FURTHER ORDERED, ADJUDGED AND DECREED that the Court finds that because they have raised [Jason] for virtually his entire life, [the Smiths] stand in the position of in loco parentis concerning the minor child, it is
FURTHER ORDERED, ADJUDGED AND DECREED that due to [the Smiths] being found to stand in the position of in loco parentis concerning [Jason,] the Court shall use the factors found in Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983) (emphasis added) to determine custody....
¶ 15. The Smiths maintain that a careful reading of the order shows that the chancellor first found that Tara had deserted Jason; he then concluded that the Smiths had assumed the role of in loco parentis because of Tara’s desertion. Everything therefore — the Smiths’ status as in loco parentis and Tara’s relinquishment of the natural-parent presumption— stemmed from the initial finding of desertion.
¶ 16. We agree with the Smiths. The chancellor found that Tara’s “long and continuous absences,” her failure “to exercise her parental rights,” and her failure to “fulfill her parental responsibilities” had caused the Smiths to stand in loco paren-tis. These actions are consistent with desertion, which means “ ‘[t]o forsake (a person, institution, cause, etc., having a moral or legal claims upon one) ... [or] [t]o forsake one’s duty, one’s post or one’s party.” Leverock, 23 So.3d at 430 n. 2 (quoting Ainsworth v. Natural Father, 414 So.2d 417, 420 (Miss.1982)). Though the chancellor never explicitly used the term “desertion,” his description of Tara’s behavior met the definition of the term. The record supports desertion as well. The GAL, for example, asserted that Jason had been in Tara’s “exclusive care and custody for a period totaling no more than twelve weeks since he had been born[,]” and that Tara had “constructively abandoned or deserted [Jason] because she [had] not offered any financial support, or made any reasonable efforts to be with the child prior to the initiations of [the] proceedings^]” (Emphasis added.) In sum, the chancellor made findings consistent with desertion, and the record supports such a finding. We will not reverse simply because the chancellor omitted or neglected to use the specific word “desertion.”
¶ 17. The chancellor’s order further stated that “due to [the Smiths] being *49 found to stand in the position of in loco parentis concerning [Jason,] the Court shall use the factors found in Albright ...” to determine custody. This statement was erroneous; as discussed above, in loco parentis does not rebut the natural-parent presumption so that an Albright analysis is warranted. Reversal is not required for this misstatement, however. The chancellor found, and the record supported, desertion. The natural-parent presumption, therefore, was properly rebutted, and an Albright analysis was justified on that basis.
¶ 18. Because the chancellor found that Tara had deserted Jason, we hold that he did not err in treating the natural-parent presumption as having been overcome. A best-interest, Albright analysis, therefore, was proper. And since no assignment of error has been raised regarding the chancellor’s Albright analysis, we affirm his decision.
CONCLUSION
¶ 19. We find that the chancellor did not err in treating the natural-parent presumption as having been overcome. Though the chancellor did not use the word “desertion,” his factual findings regarding Tara’s behavior satisfied the definition of the term. Accordingly, the chancellor properly reviewed the Albright factors and concluded that it was in Jason’s best interest to award custody to the Smiths. Therefore, we reverse the judgment of the Court of Appeals and affirm the judgment of the chancery court.
¶ 20. THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE TIPPAH COUNTY CHANCERY COURT IS AFFIRMED.
CARLSON, P.J., RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.

. The names of the parties used in this opinion are fictitious to protect the privacy of the minor child. We have carried forward the same fictitious names that were used in the opinion of the Court of Appeals.

. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). Albright listed certain factors that must be considered in determining the best interest of a child in custody cases. Id.

. In Pell, we reversed the chancellor’s termination of the husband’s parental rights and remanded the case for a best-interest Albright analysis; thus, we implicitly found that the natural-parent presumption had been overcome. Pell, 881 So.2d at 187. And in J.P.M, we relied on Pell to affirm the chancellor’s decision to award physical custody to the husband. J.P.M., 932 So.2d at 770. In doing so, we specifically rejected the wife's argument that the chancellor had not had the authority to award custody to the husband without first finding that she had abandoned the child, that her conduct was so immoral as to be detrimental to the child, or that she was mentally or otherwise unfit for custody. Id. at 768.

. Notably, Presiding Justice Kay Cobb’s special concurrence in J.P.M. criticized the majority and Pell for ”us[ing] in loco parentis to strip custody from [a natural parent].” J.P.M., 932 So.2d at 781 (Cobb, P.J., specially concurring). She emphasized that "a person standing in loco parentis has the rights of a parent as against the entire world except the natural parents." Id. "In loco parentis," she explained, "was never meant to be used against the natural parent ... [but] was intended to protect third parties, who assume custody and care of a child whose natural parents are absent or unable to care for it, from losing the child to other third parties .... ” Id. Presiding Justice Cobb’s concerns are well-taken. Yet, Pell and J.P.M. are limited to their unique facts; as discussed above, in loco parentis was just one of the factors that influenced the Court’s decision in those cases. J.P.M., in fact, stated that Pell was controlled by the following rationale: If the husband could be required to pay child support due to his continued support and care for the child, and the wife’s reliance on the same, it follows that he should have custody or visitation rights as well. J.P.M., 932 So.2d at 769 (quoting Pell, 881 So.2d at 186).