# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01283-COA

JEREMY FLYNN                                                    APPELLANT

v.

MICHAEL BLAND AND VICKEY BLAND                    APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 07/29/2015 |
| TRIAL JUDGE: | HON. MITCHELL M. LUNDY JR. |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JERRY WESLEY HISAW |
| | NANCY M. MADDOX |
| ATTORNEY FOR APPELLEE: | TRACY BUSTER WALSH |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | AWARDED CUSTODY OF MINOR CHILD TO MATERNAL GRANDPARENTS |
| DISPOSITION: | AFFIRMED IN PART, REVERSED AND RENDERED IN PART - 08/30/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., ISHEE AND WILSON, JJ.**

**ISHEE, J., FOR THE COURT**:

¶1.     Jeremy Flynn appeals the DeSoto County Chancery Court's award of physical custody of his minor child to the maternal grandparents. Jeremy also appeals the chancery court's denial of Jeremy's request to change the minor's surname. For the following reasons, we affirm in part, reverse in part, and render.

## FACTS

¶2.     Madison Bland and Jeremy Flynn began a romantic relationship while minors, and proceeded to live together in the home of Madison's parents, Michael and Vickey Bland, in

Southaven, Mississippi. Jeremy and Madison broke up when Madison was three months pregnant and Jeremy left the Blands' home. According to Madison, she communicated to Jeremy that she was pregnant and that he was the father. However, Jeremy disputed knowing that he was the father. At trial, Jeremy and his mother testified they requested a DNA test, while Madison was pregnant, but Madison refused. Madison testified that she refused because she thought the DNA test would be harmful to the baby. She further testified that Jeremy never asked again. The record indicates that during the pregnancy, Jeremy saw Madison several times, including when he accompanied Madison to the Medicaid office to sign up for prenatal medical benefits.

¶3. On November 10, 2006, a female child, Allyson Bland, was born. Jeremy was not at the birth, nor was he listed as the father on the birth certificate. Madison and Allyson resided with the Blands following Allyson's birth. Testimony indicates that soon after Allyson's birth, Madison took Allyson to see Jeremy, but Jeremy "ran" and was unwilling to meet Allyson.

¶4. In 2009, the Blands moved to Holly Springs, Mississippi. Madison testified that in 2010 she started working at a bar and once waited on Jeremy's sister. Soon after she saw Jeremy's sister, according to Madison, Jeremy came to visit her at work. Madison explained that she spoke to Jeremy about Allyson and reiterated that Jeremy was the father. Madison and her sister, Mallory, both testified that Jeremy showed no interest in the child and that there were several opportunities for Jeremy to connect with Madison and Allyson, but he failed to do so. In 2012, Madison moved to Hot Springs, Arkansas. By order of the Marshal

2

County Chancery Court, Madison gave her parents custody of Allyson. As such, Allyson remained with the Blands in Holly Springs after Madison moved to Arkansas.

¶5. Contrary to Madison's assertions, Jeremy insisted at trial that he did not know he was the father until he ran into Madison at the bar in 2010. Jeremy testified that in 2012, in an effort to gain custody of Allyson, he tried via social media to locate Madison. Madison testified that she was in a rehabilitation program at this time and did not respond. Madison testified that in January 2014 she responded to Jeremy's social-media message and gave Jeremy her telephone number. Jeremy stated that he then called Madison shortly thereafter and instituted the instant child-custody suit.

## PROCEDURAL HISTORY

¶6. In 2010, the Blands obtained an order awarding them custody of Allyson. However, it is undisputed that no notice was given to Jeremy. Therefore, the temporary order did not adjudicate Jeremy's custodial rights as to Allyson.

¶7. In April 2014, Jeremy filed a petition for an order of filiation, custody of the minor child, and other relief against Madison. An agreed order on DNA paternity testing was entered on June 10, 2014, for genetic testing of Jeremy and Allyson to determine paternity. The Blands then filed an intervening petition for third-party custody against Jeremy. An order of filiation and an order regarding temporary visitation and support was entered. A trial ensued soon thereafter.

¶8. On July 13, 2015, after the trial, the chancellor found Jeremy guilty of desertion. The chancellor awarded the Blands and Jeremy joint legal custody, with the Blands having

3

primary physical custody. The chancellor also declined to change Allyson's last name to Flynn. Jeremy timely filed a motion for reconsideration. The chancellor made some minor changes in the custody schedule but kept primary physical custody with the Blands and refused to change Allyson's last name. Jeremy now appeals.

**LAW AND DISCUSSION**

¶9. "In child custody cases, this Court will only disturb a chancellor's decision if such decision is manifestly wrong, clearly erroneous, or . . . [based on] an improper legal standard." *Cockrell v. Watkins*, 936 So. 2d 970, 972 (¶4) (Miss Ct. App. 2006). "A chancellor's findings of fact will not be set aside on appeal so long as they are supported by substantial evidence." *Id*. "The best interest of the child is paramount in any child-custody case." *Smith v. Smith,* 97 So. 3d 43, 46 (¶8) (Miss. 2012).

¶10. "In custody battles between a natural parent and a third party, it is presumed that it is in the child's best interest to remain with his or her natural parent." *Id.* "To be awarded custody, therefore, the third party must first clearly rebut the natural-parent presumption or preference; if it is successfully rebutted, the chancellor must then examine the *Albright*[1]

---

[1] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). The *Albright* Court held:

We reaffirm the rule that the polestar consideration in child custody cases is the best interest and welfare of the child. The age of the child is subordinated to that rule and is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the

4

factors and determine that third-party custody serves the best interest of the child." *Id.*

> The natural-parent presumption can be rebutted by a clear showing that (1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody.

*Id.* at (¶9).

¶11.    In the case at bar, the chancery court specifically found that Jeremy had deserted his child. The chancery court stated that "Jeremy did in fact know or should have known he had a child, and therefore a duty or obligation to support that child financially and emotionally since 2006." The chancery court also stated that "[o]ne cannot sit idle, and let time go by knowing that [he has] or may have a child that someone else is raising. Such is the definition of desertion[:] 'an avoidance of a duty or obligation.'" We agree.

¶12.    Here, Jeremy does not dispute accompanying Madison, while pregnant, to the Medicaid office. However, after Allyson's birth, according to the record, Jeremy was not a part of Allyson's life. There was testimony from several witnesses that Jeremy was aware of Allyson's existence. Even using the year Jeremy asserts he found out that he was the father, 2010, there is no evidence that he began to foster a relationship with Allyson at that time. The record also reflects that in 2012 Jeremy used only social media to find Madison, who responded two years later, in 2014, to Jeremy's message. The record is clear that Jeremy could have made more of an effort to locate Madison in ways other than social media,

---

> child at the age sufficient to express a preference by law; stability of home environment and employment of each parent[;] and other factors relevant to the parent-child relationship.

*Id.*

such as contacting members of Madison's family, but failed to use his resources. Instead, Jeremy waited until 2015, when Allyson was eight years old, to invoke his parental rights. We cannot find error in the trial court's finding that Jeremy deserted his child, thereby rebutting the natural-parent presumption.

¶13. With respect to physical custody, the chancery court conducted a thorough analysis of the *Albright* factors, and ultimately awarded physical custody to the Blands. The chancery court pointed out that several *Albright* factors favor the Blands, specifically that the Blands have cared for Allyson for over seven years, that she attends a good school while in their care, and that she is in a stable environment. Furthermore, Allyson has a good relationship with her half brother, who also resides with the Blands. The record clearly supports the chancery court's award of physical custody of Allyson to the Blands.

¶14. The trial court further noted that since 2014 Jeremy has played a bigger role in Allyson's life. The chancery court also pointed out his willingness and capacity to provide care, along with the emotional ties that have been established between Jeremy and Allyson. As stated earlier, so long as the chancellor's findings are supported by substantial evidence, they will not be set aside on appeal. Here, we find that the chancery court's award of joint legal custody to Jeremy and the Blands is supported by substantial evidence. Finding no error, we affirm the award of joint legal custody of Allyson to Jeremy and the Blands, with the Blands having physical custody of Allyson.

¶15. Finally, Jeremy takes issue with the chancery court's decision not to change Allyson's surname to Flynn. Jeremy cites *Rice v. Merkich*, 34 So. 3d 555 (Miss. 2010), in support of

his argument. We find *Rice* on point. *Rice* involved a child born to an unwed mother who failed to inform the father of the child's birth. *Id.* at 558 (¶2). Accordingly, the child's father was not given an opportunity to sign a paternity form. *Id.* The Mississippi Supreme Court quoted Mississippi Code Annotated section 41-57-23(2) (Rev. 2009), which provides:

> If a child is born to a mother who was not married at the time of conception or birth, or at any time between conception and birth, and the natural father acknowledges paternity, the name of the father shall be added to the birth certificate if a notarized affidavit by both parents acknowledging paternity is received on the form prescribed or as provided in [Mississippi Code Annotated] [s]ection 93-9-9 [(Rev. 2004)]. The surname of the child shall be that of the father except that an affidavit filed at birth by both listed mother and father may alter this rule.

*Rice*, 34 So. 3d at 558 (¶10).

¶16. Ultimately, the supreme court in *Rice* determined that because the mother failed to prove by a preponderance of the evidence that it was in the child's best interest that the child's surname not be that of the father, the child should bear the father's surname. *See id.* at 559 (¶16). In doing so, the supreme court noted that, in addition to conforming with applicable statutes on the topic, the decision also adhered to the Rules Governing the Registration and Certification of Vital Events by the Mississippi State Department of Health. *Id.* at 558-59 (¶¶11-12).

¶17. Furthermore, "in the event of court-determined paternity, the surname of the child shall be that of the father, unless the judgment specifies otherwise." Miss. Code Ann. § 93-9-9(1). As explained in *Rice*, "[a]lthough the statute does not delineate those circumstances where the 'judgment specifies otherwise,' it is reasonable to conclude that those circumstances should be examined in light of the best interest of the child, if, and only if, this

7

is a contested issue." *Rice*, 34 So. 3d at 557 (¶8).

¶18.    Here, the record is clear the Blands did not contest the change-of-name request and have failed to show by a preponderance of the evidence that it is not in the best interest of Allyson to bear her father's surname. We reverse the chancery court's decision on this issue, and render the change of Allyson's surname from Bland to Flynn in accordance with section 93-9-9(1).

¶19.    **THE JUDGMENT OF THE DESOTO COUNTY CHANCERY COURT IS AFFIRMED IN PART, AND REVERSED AND RENDERED IN PART. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE HALF TO THE APPELLANT AND ONE HALF TO THE APPELLEES**.

     **LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, JAMES, WILSON AND GREENLEE, JJ., CONCUR.**