# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-01288-COA

IN THE MATTER OF THE GUARDIANSHIP OF        APPELLANT
B.P.: MICHAEL P.

v.

PATRICK THOMAS AND JENNIFER THOMAS        APPELLEES

DATE OF JUDGMENT:        10/18/2021
TRIAL JUDGE:        HON. KILEY CATLEDGE KIRK
COURT FROM WHICH APPEALED:        CHOCTAW COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        MARK G. WILLIAMSON
ATTORNEYS FOR APPELLEES:        MARTY CRAIG ROBERTSON
       JOHN S. GRANT IV
NATURE OF THE CASE:        CIVIL - CUSTODY
DISPOSITION:        AFFIRMED - 08/22/2023
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McCARTY AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1. On October 18, 2021, the Choctaw County Chancery Court entered a "Judgment and Opinion" that vested Patrick and Jennifer Thomas (the Thomases) with legal and physical custody of B.P.[1] B.P.'s biological father, Michael P., was vested with graduated visitation rights ultimately ending in standard visitation.[2] The chancery court held that the Thomases were successful in overcoming the natural parent presumption by clear and convincing evidence and that as a result of Michael's behavior on December 26, 2018, at the Thomases'

---

[1] Initials are throughout to protect the identity of the minor child.

[2] B.P.'s biological mother, K.P., had her rights terminated pursuant to the judgment; however, she is not a party in this appeal.

home, Michael was unfit to exercise custody of his minor child. The chancery court stated that "[h]is actions reflect[ed] a lack of concern for others and principally his daughter's safety. This conduct placed selfish behavior above his daughter's well being." Aggrieved by the chancery court's judgment, Michael appealed.

## FACTS AND PROCEDURAL HISTORY

¶2. Michael and K.P. were married and had three children, G.P. (born in August 2013), R.P. (born in October 2014), and B.P. (born in January 2018). B.P.'s custody is the central issue in this appeal. Prior to B.P.'s birth, but while K.P. was pregnant with B.P., Child Protective Services (CPS) opened an investigation regarding Michael and K.P.'s home after receiving a report in August 2017 alleging that on at least one occasion, G.P. had gotten out of the house unsupervised without either Michael or K.P.'s knowledge. On March 14, 2018, CPS initiated a family team meeting, and it was decided that two guardianships would be established for Michael and K.P.'s children. One guardianship would be established for G.P. and R.P. with Michael's father and stepmother as their named guardians. A second guardianship would be established for B.P. with the Thomases as her named guardians. Michael alleges that the guardianships were temporary in nature and established because he was leaving to attend the police academy and K.P. was going to be receiving in-patient treatment for mental health issues. According to Michael, as a result of both natural parents' temporary absence from the home, the guardianships were necessary. However, other evidence presented at trial indicated that as a result of the CPS investigation, the guardianships were inevitable if the parents wanted to keep their children out of the State's

2

custody.

¶3.     Dawn Williams testified at trial about Michael and K.P.'s lifestyle, parenting skills, and her role in caring for G.P., R.P., and B.P. prior to and up until the CPS investigation and the creation of both guardianships.  Williams testified that she was related to Michael, and was  called upon frequently by K.P. to help care for G.P. and R.P.  According to Williams, she visited Michael and K.P.'s home when they were living in a family camp house in Montgomery County and also when they moved to Ackerman.  Williams testified that the camp house was in such disrepair that she and a group of church members went to the home in February 2017 to clean up and make needed repairs to the couple's home.  Williams described the house as unclean and unsanitary and stated that there was garbage and debris everywhere.  She further testified that there was no running water and that the men from the church tried to restore water to the camp house.  Williams stated that they caulked around the house, repaired broken windows and holes in the porch, and removed debris and garbage. Michael was not at the camp house on the day that the cleaning and repairs were made. Instead of helping the church members clean and make repairs, he was hunting.  According to Williams, Michael and K.P.'s home in Ackerman was in no better condition.  Williams testified that during the winter months, only one room in the home had heat.  K.P. told Williams that shortly after B.P. was born, when Michael was working the night shift, "[K.P.] and the kids would have to go into a different bedroom with no heat to sleep or to play while he slept in the heated bedroom."  Williams testified she believed that Michael did not take care of the children and that Michael would "stay out all night sometimes" and leave K.P.

3

and the children at home by themselves without a vehicle. Williams specifically made reference to one night when a tornado came through the area, and K.P. and the children were left alone at the camp house to fend for themselves without a car. Finally, Williams testified about an occasion when Michael and K.P. told her that G.P. had mistakenly ingested a Xanax and was taken to the hospital. According to Williams' testimony at trial, she told Michael and K.P. that "something had to be done or the kids were going to be hurt or taken away."

¶4.     After the CPS team meeting on March 14, 2018, Michael, K.P., and the Thomases jointly filed a "Petition for Guardianship of the Person" requesting that the chancery court award the Thomases guardianship of B.P. on March 27, 2018. An order appointing the Thomases as guardians was entered on April 10, 2018. Michael exercised some visitation with B.P. after the guardianship was created and throughout the remainder of the year.

¶5.     On December 26, 2018, Michael and his girlfriend, Hannah, went to the Thomases' home to exercise Christmas visitation with B.P. This visitation had been previously arranged by Michael and Patrick Thomas and was to take place in the Thomases' home. The version of events that followed on the day of the pre-arranged visitation varied among the parties and will be discussed in more detail in the analysis below. Essentially, Michael walked out of the Thomases' home with B.P. and attempted to remove her from the Thomases' custody. The testimony at trial was undisputed that Michael was wearing a concealed weapon that was later taken by law enforcement once they arrived on the scene.[3] B.P. was ultimately returned to the Thomases' care and custody.

_____

[3] At the time of the incident, Michael was employed with the Choctaw County Sheriff's Office.

¶6.     On January 24, 2019, Michael filed a petition to terminate the guardianship that was established on April 10, 2018, appointing the Thomases as B.P.'s guardians.[4]  The next day, on January 25, 2019, the Thomases filed a petition to terminate Michael and K.P.'s parental rights and requested to adopt B.P. in a separate cause number in Choctaw County.  Also on January 25, 2019, Michael and K.P. filed a "Bill of Divorce" with an attached "Child Custody and Property Settlement Agreement."[5]  The Thomases also filed a motion to stay the proceedings in the guardianship case until the adoption matter was complete.[6]  Finally, the Thomases filed a counter-claim for third-party custody within the guardianship case on March 12, 2019.

¶7.     On February 12, 2019, Robert Thomas was appointed as the guardian ad litem (GAL) for B.P. and was tasked with making a recommendation to the court as to what visitation, if any, should be granted to Michael.  Between the date of the GAL's appointment and the date of the chancellor's judgment and opinion, numerous pleadings and orders were filed, including six temporary orders outlining different variations of visitation schedules.

¶8.     After a seven-day trial, the chancellor entered a sixty-nine-page judgment and opinion

---

[4] The guardianship established for G.P. and R.P. was terminated by agreement on February 12, 2019, and Michael regained physical custody of those children.

[5] Pursuant to the Child Custody and Property Settlement Agreement, the parties agreed that "[Michael] shall have full legal and physical custody of the three (3) minor children . . . , subject to the restricted and supervised visitation rights of [K.P.], which shall be at [Michael]'s direction and discretion."  A "Final Decree of Divorce" was entered on May 14, 2019, with the parties' Agreement attached as Exhibit "A."

[6] Ultimately the guardianship case and the adoption case were consolidated pursuant to an order dated June 5, 2019.

on October 18, 2021, which granted custody of B.P. to the Thomases subject to certain visitation rights awarded to Michael. K.P.'s parental rights were terminated pursuant to the judgment. The chancellor held that the Thomases successfully rebutted the natural parent presumption and after an *Albright* analysis, determined it was in B.P.'s best interest to remain in the Thomases' custody. *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). Michael filed his notice of appeal on November 16, 2021.

## STANDARD OF REVIEW

¶9. "This Court employs a limited standard of review in child-custody cases and will 'affirm findings of fact by chancellors . . . when they are supported by substantial evidence unless the chancellor abused her discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.'" *Carter v. Carter*, 204 So. 3d 747, 756 (¶37) (Miss. 2016) (quoting *Borden v. Borden*, 167 So. 3d 238, 241 (¶4) (Miss. 2014)). "This Court may reverse a chancellor's finding of fact only when there is no 'substantial credible evidence in the record' to justify his finding." *Hensarling v. Hensarling*, 824 So. 2d 583, 586 (¶7) (Miss. 2002) (quoting *Henderson v. Henderson*, 757 So. 2d 285, 289 (¶19) (Miss. 2000)). This Court reviews all questions of law de novo. *Townsend v. Townsend*, 859 So. 2d 370, 372 (¶7) (Miss. 2003).

## ANALYSIS

¶10. Michael argues only one issue on appeal. Michael claims that the chancellor erred by finding that he was unfit as a result of his actions on December 26, 2018, and, therefore, the chancellor further erred by finding that the natural parent presumption was successfully

6

rebutted as a result of this isolated event. According to Michael, "the evidence clearly show[ed] that [he] had rehabilitated himself as a parent over the two (2) years between the December 26, 2018, incident and the end of the trial in December of 2020."

¶11. "In custody battles between a natural parent and a third party, it is presumed that it is in the child's best interest to remain with his or her natural parent." *Smith v. Smith*, 97 So. 3d 43, 46 (¶8) (Miss. 2012). However, "the natural parent presumption can be rebutted by a clear showing that (1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; **or (4) the parent is unfit, mentally or otherwise, to have custody**." *Id*. at (¶9) (emphasis added). Absent a showing by clear and convincing evidence that the natural parent has abandoned the child or is otherwise unfit, the natural parent will prevail in a third-party custody contest. *McCraw v. Buchanan*, 10 So. 3d 979, 984 (¶15) (Miss. Ct. App. 2009). A finding of unfitness is necessary before the court considers the best interest of the child. *Id*.

¶12. In the case at hand, the chancellor devoted an entire section of his sixty-nine-page judgment to the chain of events that occurred on December 26, 2018. The judgment recounted the day's events in part as follows:

> As the trial unfolded, witnesses divulged troubling testimony regarding a heated incident shortly after Christmas day, 2018. . . . On December 22, 2018, Patrick wrote Michael the following text . . . :
>
>> I want to come across in a loving manner because that's truly where I'm coming from. You've had nothing at all to do with [B.P.] since [the] first of November (other than 15 minutes you got to see her at Thanksgiving). [N]o visits, no calls, no text to even see how she was doing. We just feel strongly that it's not in [B.P.'s] best interest to send her off right now. Please

7

understand that this is not about us or about you. [I]t's stric[t]ly about what [we] feel is best for [B.P.]

As a possible solution, [the Thomases] offered Michael their home on December 26, 2018 for visitation. This invite extended to B.P.'s siblings . . . Seemingly concerned by this limitation, Michael and Hannah bandied about a plan to take [B.P.] from [the Thomases]. This involved being bold, decisive and according to Michael, required mental preparation. Mapping out possible obstacles and reactions of these guardians was key to the plan's success. . . .

Michael entered his cousin's home, was handed the child and soon thereafter, he walked out. Michael exclaimed on one of the videos introduced into evidence, "I tried to do this the right way. . . ." Michael handed the small child to Hannah. Hannah strapped the child into a back car seat next to her. . . . Jennifer jumped into the vehicle, occupied the driver's seat, and Michael and Patrick tussled. Only a few feet away, the child sat helplessly, awaiting the results of the confrontation. . . .

Michael admitted fear, because Patrick's father approached him with a raised board. Michael then reached behind his back, feigning the use of his concealed pistol. Hannah recalled that Patrick's dad dropped the board once Michael reached behind his back. . . .

Law enforcement arrived. . . . Deputy Marcus Rodriguez obtained Michael's weapon, convincing him to seek guidance from an attorney. After the heightened emotions faded, and uncertainty found replacement with order, B.P. was extracted from the vehicle and returned safely to [the Thomases]. . . .

Ultimately, what turned out to be an extremely ambitious plot, crash landed, as did Michael's relationship with that part of his family. Thankfully, what could have ultimately resulted in someone's death or serious injury never resulted. . . . Michael's acts also defined a portrait of selfishness and very poor judgment.

Finally, the judgment read that while Michael's actions did not "escalate to the level of divesting him of his parental rights, this departure [was] sufficient for his loss of the parental presumption."

¶13.   Multiple witnesses testified at trial regarding the events that occurred on December

8

26, 2018. According to Michael's father, he talked with Michael prior to the encounter at the Thomases' home. Michael's father testified that he told Michael, "Mike . . . you need to be patient. . . . And I told him I disagreed with it. I wish I had done more and been more convincing and said absolutely not, but I didn't." Hannah also testified at trial and admitted that she and Michael had discussed the plan to take B.P. from the Thomases' home prior to the arranged visit on December 26, 2018. Hannah admitted that Michael carried a concealed weapon on his person that day. According to Hannah, while she didn't encourage Michael's actions, she supported his decision and took a cell phone video of the incident which was ultimately introduced as an exhibit at trial. When asked whether she thought it was a good idea for Michael to attempt to take B.P. from the Thomases' home on December 26, 2018, she testified, "[I]n hindsight, [it] probably wasn't the greatest idea."

¶14. Michael testified that he sought legal counsel before he made the decision to attempt to remove B.P. from the Thomases' custody on December 26, 2018. According to Michael, "[b]ased on that advice, I went over to the house when I was invited there. . . . They handed me [B.P.], and I turned around and walked out of the house. Didn't run. Walked to the vehicle and handed [B.P.] to Hannah." Michael stated that Patrick jumped on his back and tried to put him in a chokehold. He admitted that he had a concealed weapon on the day of the incident; however, he claimed that he never pulled it out. Michael admitted that he reached for his gun when Patrick's father, Tony Thomas, "came running from next door at his house with a 2x4 holding it like a baseball bat, hollering I'll kill you." Michael admitted that if he had it all over to do again, he "wouldn't have gone over there and tried to take

9

[B.P.] [He] would have filed it through the courts and not gone through that." Michael testified that he did not anticipate the Thomases' reaction that day to be a physical one, and "looking back on it, it's something [he] should have anticipated, but [he] didn't."

¶15. Jennifer Thomas testified that once she realized that Michael intended to leave their home with B.P., panic set in. According to Jennifer, she ran out of the house screaming for help and called 911 on her phone. She testified that she asked her daughter E.T. to call other family members who lived close by to come help. While Michael was placing B.P. in the backseat of his car with Hannah's assistance, Jennifer jumped in the driver's seat to prevent Michael from leaving the driveway. Jennifer testified that "all I could think about was . . . Michael is out of control, and he has a gun. And he has my husband by the throat and my then 12 or 13-year-old daughter standing on the front porch with my son inside and [B.P.] in the backseat, and it was the most terrifying experience I have ever been in." Jennifer stated that family members and law enforcement ultimately arrived on the scene to help. At some point during the scuffle, Jennifer took the keys out of the ignition of Michael's car and threw them across the yard. Jennifer's nephews also barricaded Michael's car in the driveway with their truck to keep him confined to the driveway. According to Jennifer, Michael reached for his gun twice during the altercation.

¶16. The Thomases' daughter E.T. testified at trial regarding what she observed and the actions that she took on December 26, 2018. Her testimony was very similar to that of her mother's. According to E.T., her mother asked her to call for help, so she placed a FaceTime call to her grandparents next door. Shortly after her call, Tony Thomas came over to their

10

house to assist the family in keeping B.P. on the Thomases' premises. E.T. also made a FaceTime call to her Aunt Stacy. E.T. testified that multiple aunts, uncles, and cousins came to the family's aid as a result of her FaceTime calls.

¶17. Patrick's testimony regarding the events of December 26, 2018, did not vary much from the other witnesses at trial; however, he did provide some context to his father's involvement in the altercation. While Michael had testified that he feared for his life when he was approached by Tony, Patrick explained that any fear that Michael claimed was exaggerated and misplaced. According to Patrick, his seventy-five-year-old father was fighting bladder cancer at the time and not in the best physical health. Patrick also testified that during the altercation, Michael reached for his concealed weapon four times.

¶18. Other witnesses at trial testified that Michael lost his job as a result of his actions on December 26, 2018. However, more significant to this appeal, the chancellor reasoned that Michael also "lost his parental presumption through his involvement in the December 26, 2018 incident."

¶19. In his judgment, the chancellor noted this Court's decision in *Roberts v. Conner*, 332 So. 3d 272, 283 (¶30) (Miss. Ct. App. 2021), by stating, "Parental rights, as is true of other fundamental rights, can be forfeited or taken away, and our law does recognize some means by which third parties can overcome the law's preference of natural parents. . . . The law protects the best interests of the child by its recognition that a natural parent's 'liberty interest . . . in the care, custody, and management of their children and families,' is not an absolute right." Further, in *S.C.R. v. F.W.K.*, 748 So. 2d 693, 700-01 (¶43) (Miss. 1999), the

11

Mississippi Supreme Court held that the singular action of a natural parent was enough to successfully overcome the natural parental presumption. The supreme court held:

> The [trial] court made a specific finding that S.C.R.'s willingness to compel his son to report a false charge of sexual abuse against his maternal uncle demonstrates a profound lack of respect for honesty, truth and rectitude of conduct. The trial court determined that S.C.R.'s actions evidenced a lack of concern for proper training and rearing of his child and a propensity to resort to the use of untruth to gain his desire, all without regard for the impact upon his children or upon those who are falsely accused. The court found that S.C.R.'s conduct was so immoral as to be detrimental to his children. After carefully reviewing all of the evidence presented, we conclude that substantial credible evidence exists in the record to support the trial court's finding that the rebuttable presumption that the children's best interest is served by placing custody in a surviving natural parent was successfully overcome by clear and convincing evidence that S.C.R. intentionally instructed his minor son to make false allegations of sexual molestation against the child's maternal uncle.

Similarly, in the case at hand, Michael's actions in the singular incident on December 26, 2018, showed a lack of respect for the legal process and the court order that vested the Thomases with the guardianship of B.P. Michael exhibited extremely poor judgment in bringing a concealed firearm to a visitation with his small child, knowing all along that he planned to take the child out of the custody of her legal guardians. He acted without regard for the impact that his actions had on his child as well as the Thomases and their minor children. Michael admittedly resorted to taking matters into his own hand and did not fully appreciate the potential reactions of everyone involved. Because of the actions that Michael took on December 26, 2018, we find that the chancellor did not abuse his discretion in finding that the Thomases successfully rebutted the natural parent presumption. Michael did not appeal or challenge the chancellor's analysis of the *Albright* factors in determining that it was in B.P.'s best interest to remain in the Thomases' custody. Therefore, a further

12

analysis of the chancellor's ruling is not needed.

## CONCLUSION

¶20.     After reviewing the record, we find no error in the chancery court's decisions that the

Thomases successfully rebutted the natural parent presumption and that it was in B.P.'s best

interest to remain in the Thomases' custody.  Therefore, the judgment of the chancery court

is affirmed.

¶21.     **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.  WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.  McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**