# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01580-COA

| | |
|---|---|
| **KELLY R. BURGE** | **APPELLANT** |

**v.**

| | |
|---|---|
| **CRAIG A. BURGE AND CHADWICK A. SHARFF** | **APPELLEES** |

| | |
|---|---|
| DATE OF JUDGMENT: | 09/16/2015 |
| TRIAL JUDGE: | HON. M. RONALD DOLEAC |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | PHILLIP LLOYD LONDEREE |
| ATTORNEYS FOR APPELLEES: | ALLEN FLOWERS |
| | EARL LINDSAY CARTER JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | FOUND KELLY BURGE'S NATURAL-PARENT PRESUMPTION REBUTTED; FOUND CHADWICK SHARFF'S NATURAL-PARENT PRESUMPTION REBUTTED; AND AWARDED CHILD CUSTODY TO CRAIG BURGE |
| DISPOSITION: | AFFIRMED - 08/01/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND WESTBROOKS, JJ.**

**BARNES, J., FOR THE COURT:**

¶1. This case stems from a divorce action filed by Craig Burge against Kelly Burge in the Lamar County Chancery Court. Craig and Kelly had two children together, and Kelly also had physical custody of her two children born of a prior marriage to Chadwick Sharff (Chad). In Craig's complaint for divorce, among other matters, he sought physical and legal custody of all four children, claiming he acts *in loco parentis* as to the two Sharff children.

Subsequently, Chad filed a petition to join Craig's request for custody of all four children so as not to separate the children or, in the alternative, grant Chad custody of his children. In the Sharff divorce case, assigned to a different chancellor, Chad moved to transfer and consolidate his case with the Burges' case. Craig also sought to consolidate the cases. In turn, Kelly filed a motion for summary judgment, alleging that the chancery court did not have jurisdiction over the Sharff children. Craig's and Chad's motions to consolidate were granted, and Kelly's motion for summary judgment was denied.

¶2. The seven-day trial spanned over six months. At the conclusion of Craig's and Chad's case-in-chief, Kelly made an ore tenus motion for an involuntary dismissal of Chad's petition for modification of child custody and support, which was granted. In a ninety-page opinion, the chancellor granted Craig a divorce on the grounds of uncondoned adultery, and awarded him legal and physical custody of his two minor children, as well as of the two Sharff children. The chancellor found Kelly's natural-parent presumption had been rebutted with regard to the Sharff children because of her immoral conduct and mental unfitness. Additionally, the chancellor found Chad's natural-parent presumption rebutted because he had abandoned his children, and was also unfit for custody.

¶3. Kelly appeals the judgment of the chancery court, raising two issues related to the Sharff child-custody ruling: (1) whether her natural-parent presumption was overcome, and (2) whether modification of the Sharff action was proper when the claim had been involuntarily dismissed. Finding no error, we affirm.

2

## PROCEDURAL HISTORY

¶4.     Craig and Kelly were married on June 2, 2004, after a three-week courtship. She had been divorced from Chad for approximately four months. Craig and Kelly separated in February 2013 in Purvis, Mississippi. Two children were born of the marriage: Paula, a female child born in 2005, and Peter, a male child born in 2008.[1] Prior to her marriage to Craig, Kelly was married to Chad from 1998 until February 2004. Two children were born of their marriage: Phillip, a male child born in 1998, and Perry, a male child born in 2001. In the Sharff divorce judgment, Kelly was awarded physical custody of Phillip and Perry Sharff, with Chad to pay child support.

¶5.     In March 2013, Craig filed for divorce and requested custody of all four children, claiming to act *in loco parentis* for the Sharff children. Craig named Chad as a nominal party related to custody of the Sharff children. Craig alleged that Chad was not active in his children's lives, and Chad's whereabouts were unknown. All of the children lived in the Burge marital home. In April 2013, the chancellor entered a temporary order whereby both parties agreed to share joint legal custody, but Craig would have temporary physical custody of all four children. Kelly would have visitation every other weekend, and Craig had temporary use and possession of the marital home. Both parties were enjoined from exposing the children to romantic interests.

¶6.     In August 2013, Chad answered the Burge divorce petition, even though he had not

---

[1] Pseudonyms have been used to protect the identity of the minor children.

been served with process in the matter and filed a petition to join the Burge case. He denied that Craig stood *in loco parentis* to his children. However, Chad joined Craig's request to award custody of all four children to Craig so as not to separate the children. In the alternative, he requested modification of child custody to him. Also in August 2013, Craig filed a petition for contempt, claiming, among other matters, that Kelly violated the temporary order by exposing the children to her paramour, Burke Williamson, during visitation. A guardian ad litem (GAL) was appointed for all four children. In September 2013, the chancery court issued a second temporary order, directing the children not be exposed to Burke, and Chad's child-support payments be paid to Craig through the trust account of Kelly's attorney. In December 2013, Craig filed an emergency petition claiming Kelly had ignored these directives.

¶7. In June 2014 in the Sharff case, Chad filed a petition for modification of child custody to him, citing Kelly's divorce proceedings with Craig as a material change in circumstance. Chad also claimed that he continued to pay child support for his two children, in contradiction to Kelly's assertions to Craig. Chad also filed a motion to transfer and consolidate his case with the Burge case. Likewise, Craig requested consolidation of his and Chad's case. Kelly also filed a motion for summary judgment claiming the chancery court lacked jurisdiction over the Sharff children.

¶8. In October 2014, an order consolidating both cases was entered, and trial began in December 2014, and continued for several dates until July 2015. In September 2015, the

4

chancery court entered its opinion and final judgment. The chancellor granted Craig a divorce from Kelly on the grounds of uncondoned adultery. Kelly's natural-parent presumption as to the two Sharff children was rebutted, as the chancery court found her conduct "so immoral as to be detrimental to the children," and that she was "unfit, mentally or otherwise, to have custody." Chad's natural-parent presumption was also rebutted, with the court finding he abandoned and deserted his two (Sharff) children, and that he too was mentally unfit to have custody. Under an *Albright*[2] analysis, Craig was granted legal and physical custody of all four children. Kelly was ordered to pay Craig child support, and Chad was ordered to pay $300 per month for his two children. Kelly was also found in contempt of court for her repeated failure to prevent the children's exposure to Burke, as ordered, and failure to remit to Craig child support and her share of medical expenses for the children, which amounted to $4,558.11. The chancellor stated the Sharff case was "hereby modified as to Chad and Kelly's custody, visitation, and child support . . . and all provisions not modified remain in force and in effect." Kelly timely appealed.

**STATEMENT OF FACTS/TRIAL TESTIMONY**

¶9.     Over the course of the seven-day trial, seven volumes of trial testimony were taken from numerous witnesses, and sixty-three exhibits were entered into evidence.[3] Since this case is primarily driven by the facts, we find it necessary to relate them in some detail.

---

[2] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

[3] Chad did not appear at trial but was represented by counsel.

¶10.   At the time of Craig and Kelly's marriage, Phillip Sharff was five years old, and Perry Sharff was two years old. Craig put the two boys on his medical insurance, and "took over as their dad" since Chad was mostly absent. The Sharff children knew Craig as "Dad," although they did enjoy seeing Chad. Both boys wanted Craig's last name of "Burge" on the back of their baseball jerseys. Craig testified he was there for all four children and his parenting skills are "off the chart." He maintained that he wanted custody of all four children.[4]

¶11.   Craig works for his family as a log loader. The marital home was a house built before the marriage by Craig on his family's property in rural Lamar County. During the marriage, Kelly stayed at home, keeping the house and caring for the children. She homeschooled them and, according to Craig, initially did a good job. Kelly felt it was best because the children allegedly suffered from dyslexia and had attention-deficit issues. However, Craig was not in favor of homeschooling. In late 2012, Kelly decided to sell Visalus diet shakes part-time. Craig would keep the children while Kelly attended the sales meetings. Toward the end of the marriage, Craig testified that the children were often left with the oldest child, Phillip, or Craig's family members when Kelly left the house, which became more frequent. When the couple received a $25,000 Christmas gift, Kelly decided to spend $8,500 on breast-augmentation surgery less than a year before they separated, claiming a model-like figure

---

[4] At one point, Craig considered adopting the Sharff children but changed his mind. Kelly supported the adoption.

6

would help her Visalus sales.

¶12. Craig and Kelly separated in February 2013, when Craig came home from church and Kelly said she was sorry he was "still trying" with regard to their marriage. Since September 2012, Kelly had been communicating with her soon-to-be paramour Burke in Jackson. Burke was an old classmate of Kelly whom she had contacted when she was selling Visalus shakes. He was a former soldier with post-traumatic stress disorder (PTSD) and a drinking problem, and Kelly said she was trying to help him "find the Lord." In December 2012, an incident occurred where Kelly frantically insisted Craig drive her to Jackson in the middle of the night to check on Burke because he was allegedly suicidal. Upon arrival at Burke's apartment, they found him passed out from alcohol consumption but unharmed. Craig instructed Kelly to have no more communication with Burke, as it was not good for their marriage. Kelly agreed. Burke later texted Craig that he had "no designs on [his] wife. I don't know why she is so taken with me" and further, that he was "not sleeping with [Kelly] and wouldn't if [he] could" because he is a "good soldier."

¶13. In January 2013, another incident occurred. Kelly told Craig she was going to Grenada to see her aunt. Upon Kelly's return, Craig saw a photograph posted on Facebook where Kelly was sitting on a bed topless with her back to the camera and an American flag draped around her hips. Kelly denied the photograph was inappropriate, explaining that the photograph was for a wounded-warrior organization that helped soldiers with PTSD. She defended it as "Christian."

7

¶14. In March 2013, after the couple's separation, Kelly checked herself in to Pine Grove, a behavior health and addiction treatment center in Hattiesburg, where her mother worked as a nurse. Kelly told Pine Grove that she was "torn between two men," and had been depressed and suicidal for fourteen years. She was diagnosed with a broad range of maladies including depression, anxiety, insomnia, and "magical thinking." Craig stated that before her admission, Kelly was having "intrusive thoughts" and was suicidal; Kelly denied this accusation. During her five-day stay, Burke sent Craig a text message letting him know that Kelly wanted Burke to call her at Pine Grove, but stated: "You don't have to worry about me anymore . . . but the next guy she finds won't be as moral as I am." Burke then told Craig that the weekend Kelly said she went to her aunt's house in Grenada, she had actually come to Jackson to have lunch with Burke. They had drinks and ended up at Burke's apartment in bed. Burke said Kelly wanted to have sex, but Burke refused. Burke texted Craig: "[W]ith the ease [Kelly] went from trying to sell me shakes to wanting to be with me I doubt I'm her first." Burke then offered to send Craig several raunchy "sex texts" between Kelly and him. Craig assented, and Burke sent a series of sexually explicit text messages to Craig. Kelly later testified that Burke made up the messages. The chancellor later found these texts "troubling."

¶15. The same morning the sex texts were sent, Pine Grove staff requested Craig come for a family meeting with Kelly and "expect the worst," because the marriage was broken and Kelly was leaving. However, Kelly maintained that the marriage was over long before she

went to Pine Grove. When confronted by Craig, Kelly admitted the sexual texts with Burke were valid, and that she went to Burke's apartment instead of her aunt's house. Kelly also admitted to Craig that she had committed adultery with Burke.[5] In response, Craig told Kelly not to return to the marital house. Kelly claimed she was "kicked out" of the house.

¶16.   Upon discharge from Pine Grove, Kelly supposedly stayed with her parents for a few days and then moved into Burke's apartment in Ridgeland. Again, the exact dates vary. She claimed Burke "stayed elsewhere." Kelly did not comply with the Pine Grove discharge recommendations of therapy, medications, and ninety days of Alcoholics Anonymous. At some point Kelly rented an apartment near Burke's in the same complex. He paid for her rent, utilities, food, and all of her expenses because she was "homeless and destitute." Kelly described Burke as her "soul mate, rock, and best friend." She testified that she is happy with him, and he would probably be her boyfriend once the divorce is concluded.

¶17.   Craig testified that he takes care of the children's needs, even though he works long hours. He receives help from his nearby family members as needed for child care and tutoring. Craig lives in the marital four-bedroom home near Purvis, while Kelly now lives in a three-bedroom apartment in Pearl. Kelly's parents live in Hattiesburg, and her grandparents live in Purvis, but she testified she plans on staying in the Jackson area. At the time of trial, Kelly had a new job at a day care making $12 an hour for a forty-hour work

---

[5] Craig later filed an alienation-of-affection lawsuit against Burke. At one point, Kelly admitted she started having sex with Burke in July 2013; however, the dates their sexual relationship commenced vary.

week. Kelly testified that she has no mental-health issues; her depression was cured by prayer.

¶18. During their marriage, Craig testified that Kelly received $23,790 in child support from Chad that he did not know about. At a certain point, Kelly told both Craig and the Sharff children that she did not know whether Chad was "dead or alive," and that she had received no child support from him. Later, Craig learned Chad had not missed a child-support payment since October 2007. Further, Chad stated Kelly had thwarted his visitation efforts. Under the court's second temporary order of September 19, 2013, Kelly was to pay Craig any child-support payments received by Chad, but admittedly did not. Craig stated she owed him $5,474.46 for the amount paid by Chad since the temporary court order. Craig calculated he had spent $24,777.60 in medical insurance for the Sharff children since his marriage to Kelly, in addition to medical and dental expenses for the children.

¶19. Craig testified that Kelly started drinking at home toward the end of their marriage. He found empty Crown Royal bottles in the house. Kelly's bank statements were entered into evidence showing Chad's child-support payment deposits as well as Kelly's liquor purchases. Craig also noted there were no rental or utility payments listed, although Kelly said she had her own apartment. Craig complained that Kelly did not use the child-support payments she received for the children, but on herself.

¶20. At the time of separation, Kelly was still homeschooling all of the children. Craig would come home from work and Kelly would be in bed with the children watching DVDs,

10

or Kelly had gone to the gym and left Phillip in charge. Kelly claimed three of the four children have dyslexia. After separation, once Craig had temporary custody, he put the children in public school, but three of the children were behind in grade level.

¶21. Craig was involved in coaching some of the children's sports, but testified that Kelly had not attended any sports events during the summer of 2013. She attended a few school programs in 2013, and had not been involved during 2014. Kelly justified her absence at sporting events and school functions by claiming the Purvis community shunned her. The children often missed sports events for visitation with Kelly. Craig testified that Kelly refused to work with him on altering the visitation schedule when there was a conflict.

¶22. Sixteen-year-old Phillip executed an affidavit making an election of preference to live with Craig. He also testified at trial. He considers Craig a father figure, and all of his siblings "a group." He did not want to be separated from them, and did not want to live in Jackson, as he has no relatives there. Also, he has to take care of his siblings more in Jackson when visiting his mother. He claimed Craig never treated the Sharff children differently. He knew Kelly lives with Burke and claimed Burke has spent the night at Kelly's apartment while he and his siblings were there. Phillip also admitted Kelly did not do a good job homeschooling. When he started school in Purvis, Phillip stated he was behind in every subject and his mother did nothing to help because she did not attend parent-teacher meetings or sporting events. Playing sports is important to Phillip, but he said his mother makes him feel bad for missing visitation on Fridays. Before separation, Phillip commented that his

11

mother was present in the home but "not really there." She also tended to "quit when things got tough," and left him in charge. In the past, Phillip had agreed to be adopted by Craig, although it never occurred.

¶23. Craig worried that if Kelly were awarded custody, she would return to homeschooling the children, as she is "completely disgusted" that her children are now in public school in Purvis. He was also concerned about Kelly's continued relationship with Burke, as well as his drinking problem, PTSD, and alleged atheism. Kelly was also violating the temporary order by exposing the children to Burke. The children told Craig that Burke was at Kelly's apartment when they visit their mother. During one incident, Craig testified that Burke had grabbed Peter by the shirt when Peter locked himself in a bedroom, and Peter cried when telling Craig about it, although Kelly told the children not to mention the incident to Craig. Further, text messages were entered into evidence showing Kelly wanted permission from Craig for Burke to take the children to the state fair, after the temporary order was entered that Burke should not have contact with the children. Additionally, Craig entered a photograph into evidence that Kelly had published on social media showing Kelly and Burke enjoying themselves at the Ritz Carlton lounge in Georgia. Instead of exercising visitation with her children one weekend, Kelly had attended a lavish "Williamson family vacation" with Burke and his family.

¶24. Burke is a web designer that works for C Spire. Burke testified that his home mailing address is Kelly's address in Pearl. He was aware of the temporary court orders but unsure

of when he realized he was prohibited from being around the children. He admitted that he is Kelly's boyfriend. She moved into his place, and they started having sex in June 2013; however, she pursued him. He claimed that when Kelly told the GAL they were not having "relations," that was untrue. Burke admitted the sex texts he sent to Craig were meant to hurt Craig. Burke had edited them in order to make the communications more painful to Craig and cast Kelly in the worst light possible; however, Kelly has forgiven him. He said he had no interest in getting married to Kelly even if she were awarded custody. Burke also admitted he had been around the children during visitations. In his deposition, it was his opinion that if Kelly had custody of her four children, it would be "an F'ing nightmare."

¶25. Kelly agreed the children should not be separated, but that she should have custody. Kelly stated she was the children's primary caregiver during the marriage. Kelly denied telling the GAL that Chad and Craig were colluding to deprive her of custody of her children,[6] as well as that she hid child-support funds before or after the separation. She claimed that Craig told her she did not have to pay him child support since the separation, and she used the funds to pay for the court-ordered psychologist. However, she admitted "it was not a matter of need" and she knew she was violating a court order. She also admitted not paying Craig for the children's medical expenses.

¶26. Kelly acknowledged that Craig was the father figure and role model for all of the

---

[6] However, this is an argument Kelly makes on appeal regarding Chad's petition to modify child support and its involuntary dismissal.

13

children. Regarding Phillip's sports schedules and visitation, she claims that if the situation were reversed, she would force Phillip to visit Craig, as "family comes first." She described her parenting skills as excellent, stating she has been a baby sitter, day-care worker, and homeschool teacher, and went to parenting and continuing-education classes. She believes the Bible teaches how to raise a child. Further, she stated that her sexual immorality should be discounted because she did not have sex with Burke until after separation from Craig, and thus it does not actually constitute adultery. Kelly accused Craig of marital rape for years, assuring the court she had apprised Pine Grove of the matter; however, no record of the allegation was found. Kelly admitted that Burke had been around the children numerous times despite the temporary order, and if she received custody he would be with them "a lot." Chad's whereabouts are unknown to her; she believed at one time his parental rights should be terminated, but now she "just wants him out of the picture." She believes this scenario would be best for the Sharff children.

¶27.  Kelly's support system in Jackson would consist of day-care centers related to her work, and relatives. She claimed she just agreed to Craig's temporary custody at the outset of the case to allow the children to finish out the rest of the school year before she was awarded custody. Kelly explained when she drank too much it was to steel herself because Craig had a penchant for rough sex, but she denied alcoholism. Kelly claims to suffer from dyscalculia, a condition that impacts her ability to remember dates, times, and directions. Additionally, Kelly said she missed school events because Craig did not inform her, and she

should not have to look up events on a website. Kelly denied that her homeschooling efforts constituted "baby sitting." Kelly acknowledged that Burke is on an antidepressant. Kelly stated she is comfortable with the children seeing her American-flag photograph. She explained that the decision to go on Burke's family's vacation during her visitation weekend was not wrong and was in the best interest of the children because she "had to be mentally strong." Kelly acknowledged she is at her third job since the case began, making $33,000 a year at a day care.

¶28. At trial, Dr. Daniel Moore, a licensed psychologist, testified about Kelly's and Craig's court-ordered psychological evaluations. Kelly denied to Dr. Moore any suicidal ideations, although the Pine Grove records indicate Kelly told them she had experienced fourteen years of suicidal thoughts and ideations. Dr. Moore did not feel Kelly was at a significant risk for suicide; she had no symptoms of depression or anxiety and had quit taking antidepressants. Kelly's issues expressed at Pine Grove were resolved or different. He found Kelly easily manipulated, that she used drinking as an escape, and her affair created inner turmoil. Craig he deemed as psychologically fit as the general population.

¶29. The GAL, James Johnson, submitted three reports over the course of the case and testified at trial. He found the children were doing well in Craig's custody, and while both parents had safe abodes, the children did not want to stay at Kelly's apartment. The GAL stated it was in their best interest to stay together. Johnson stated the children's needs were better met with Craig regarding protection and provision. Moreover, Chad chose Craig over

15

Kelly to parent his children. He noted Kelly has stability in Pearl, but her continued relationship with Burke is confusing to the children. He was not concerned with Burke's PTSD if the children did not spend the night with him. Johnson agreed with Dr. Moore that Kelly has no mental issues of concern now; Kelly's stay at Pine Grove appeared to be more "respite" type care encouraged by her mother. Johnson stated Kelly perceives herself as a victim. Additionally, Burke's dishonesty with the court was potentially a moral-fitness concern. Johnson also stated Kelly's failure to turn over the child support paid to her by Chad for the Sharff children was a moral-fitness concern due to her knowing noncompliance with a court order. He also acknowledged discrepancies with Kelly's testimony about the date she moved in with Burke upon release from Pine Grove; however, Kelly maintained she was "back and forth" between Ridgeland and Hattiesburg during that time. Johnson recommended the children remain in public school and not be homeschooled. Ultimately, Johnson felt the children would be better off with Craig, and Kelly should have liberal visitation.

## THE CHANCERY COURT'S *ALBRIGHT*-FACTOR FINDINGS

¶30.     Upon finding Kelly and Chad's natural-parent presumption rebutted, the court conducted an *Albright* analysis for all four children.[7] Although the court's *Albright* analysis was not challenged by Kelly, there is an overlap of the analysis of the *Albright* factors with

---

[7] The chancellor did not adopt the findings of the GAL regarding the *Albright* factors, as some conclusions were different.

the natural-parent-presumption rebuttal. The court's *Albright* analysis gives more insight into the facts of the case; therefore, we shall summarize the findings. Ultimately, the court found all of the factors favored Craig but parent/child emotional ties, which was neutral.

¶31. Citing a text-message exchange between Craig and Kelly when one of the children was sick during visitation, the chancellor found age, health, and gender of the children favored Craig. Kelly had refused to take the child to the doctor for bad sinus drainage, wanting Craig to do it once her visitation was over. She claimed not to have money for the copayment, although the court noted she was able to borrow money from Burke to go to the state fair. The court found this incident "an example of how Kelly's self-perceived victimization adversely affects the children in a direct way." Continuity of care favored Craig, as the court found Kelly's homeschooling was "ineffective at best and negligent at worst." Further, no apparent problems with care of the children had been seen with Craig since the separation.

¶32. As to parenting skills and the capacity to provide child care, the court found the factor to favor Craig. While both parents expressed willingness to parent the children, the court noted Kelly's defiance of the court's order prohibiting the children from being around Burke. The court deemed Burke "detrimental to the children's best interests." The court found Kelly's failure "is due in large part to her perception that there is nothing harmful about having the children around [Burke], which the Court finds does not evince good parenting skills . . . nor good judgment." While both parents could have worked better to solve

17

visitation problems, the court deemed Kelly's actions selfish. "[E]ven older teenagers do not get to say whether they will attend visitation or not, but a parent who denies a child participation in an activity that the child enjoys and that promotes his health, his confidence, and his social well-being is thinking only of herself." Employment was found to favor Craig; both parties work during the daytime, but Kelly does not have as much family support as Craig. Physical health, mental health, and age favored Craig. The court found while both parties were close to the same age, Kelly's medical records indicate a history of depression and attention deficit hyperactivity disorder. The emotional-ties factor was deemed neutral as to Kelly and Craig. Moral fitness favored Craig, as Kelly admitted to post-separation adultery and had a pre-separation infatuation with Burke. Home, school, and community records of the children favored Craig. Even though Kelly homeschooled the children prior to the separation, they fared better academically under Craig's custody in public school. Further, in the Purvis/Hattiesburg area, the children have an extended family on both sides, have made friends, are involved in extracurricular activities, and attend school. Moving to Jackson would make them "start over" in these regards.

¶33. The children's preference applies only to the Sharff children due to the Burge children's young ages. Perry did not express a preference except to remain with his siblings; Phillip expressed a strong desire to remain with Craig; so the factor favored Craig. The stability of the home environment and employment favored Craig, who still resides in the marital home. Craig has been employed by his family's logging business for several years,

18

while Kelly is on her third job since the separation. Other factors relevant to the parent-child relationship all favored Craig. The parties' financial situation and religion favored Craig. He is better able to support the children financially, and is more active with the children in church. The chancellor found it "clearly evident that the personal values of the parents are quite different," and that factor favored Craig. Parental lifestyle also favored Craig; the court commented, "Craig appears to be focused on and oriented toward the family. Kelly, on the other hand, is focused primarily on her own interests and her relationship with Burke." Finally, Craig, Kelly, Phillip, and the GAL all indicated the children should stay together.

## STANDARD OF REVIEW

¶34. Our standard of review in child-custody cases is limited. *Borden v. Borden*, 167 So. 3d 238, 241 (¶4) (Miss. 2014). This Court will only reverse a chancellor's custody decision if it was manifestly wrong or clearly erroneous, or if an erroneous legal standard was applied. *In re Waites*, 152 So. 3d 306, 311 (¶13) (Miss. 2014). Appellate courts cannot "reevaluate the evidence, retest the credibility of witnesses, nor otherwise act as a second fact-finder." *Bower v. Bower*, 758 So. 2d 405, 412 (¶31) (Miss. 2000) (citation omitted). Questions of law are reviewed de novo. *In re Custody of M.A.G.*, 859 So. 2d 1001, 1003 (¶4) (Miss. 2003).

## ANALYSIS

¶35. Kelly raises one substantive and one procedural argument related to the two Sharff children and the rebuttal of her natural-parent presumption. We shall address each in turn.

### I. Rebuttal of Kelly's Natural-Parent Presumption

¶36.    Kelly argues that it was error for the chancellor to find her natural-parent presumption as to her children with Chad was rebutted because of immoral conduct and unfitness. Kelly states these findings were improperly based on her continued relationship with her paramour, Burke, and the failure to comply with the chancery court's temporary orders regarding payment of child support to Craig and the children's exposure to Burke. Kelly also argues that the chancellor applied an erroneous legal standard in making the findings that engaging in a post-separation affair and acting in contempt of a court order constitute moral or mental unfitness sufficient to rebut the natural-parent presumption. We disagree.

¶37.    "The best interest of the child is paramount in any child-custody case." *Smith v. Smith*, 97 So. 3d 43, 46 (¶8) (Miss. 2012). "In custody battles between a natural parent and a third party, it is presumed that it is in the child's best interest to remain with his or her natural parent." *Id*. In order to be awarded custody, the third party must rebut the natural-parent presumption by clear and convincing evidence. The natural-parent presumption is rebutted by clearly showing: "(1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody." *Id.* at (¶9) (citations omitted). If successful, the chancellor must next examine the *Albright* factors and determine if third-party custody is in the best interest of the child. A finding of unfitness is necessary to award custody to a third party over a natural parent, and is done before analysis of the *Albright* factors. *M.A.G.*, 859 So. 2d at 1004 (¶6).

20

¶38. A person is *in loco parentis* "who stands in place of a parent, having assumed the status and obligations of a parent." *Davis v. Vaughn*, 126 So. 3d 33, 37 (¶11) (Miss. 2013) (citation omitted).[8] "The doctrine of *in loco parentis* does not, by itself, overcome the natural-parent presumption," although it may be a factor in determining whether the presumption has been rebutted. *Smith*, 97 So. 3d at 46-47 (¶¶10-11).

¶39. Because Craig sought custody of the two Sharff children, in addition to his own two children, the chancery court analyzed his request under the child-custody law related to the natural parent versus a third party. The chancery court found both Kelly and Chad's natural-parent presumption rebutted. Kelly's conduct was found to be immoral. In support of this finding, the court pointed to:

> [Kelly's] repeated failure to follow the Court's orders; her failure to protect her children from Burke Williamson, who the Court deems to be a danger to

---

[8] The Mississippi Supreme Court has further stated:

Any person who takes a child of another into his home and treats it as a member of his family, providing parental supervision, support and education, as if it were his own child, is said to stand *in loco parentis*. *In loco parentis* status carries with it the same duties and liabilities that belong to a natural parent, including a right to custody of the child "as against third persons."

Although this doctrine grants third parties certain parental rights, such rights are inferior to those of a natural parent. Thus, in a custody dispute between one standing *in loco parentis* and a natural parent, the parent is entitled to custody unless the natural-parent presumption is rebutted. The court may not consider granting custody to a third party, including one standing *in loco parentis*, unless and until the third party rebuts this presumption.

*Davis*, 126 So. 3d at 37 (¶¶11-12) (internal citations omitted).

the children, instead engaging Williamson in an intimate relationship; her failure to support the children by seeing that the child support money paid to her by Chad Sharff was given to Craig for the use and benefit of the children, instead of spending it on herself.

Additionally, the chancery court found Kelly unfit, mentally or otherwise, to have custody, stating:

> [T]he Court again considers [Kelly's] failures where it pertains to the children – to ensure their support, to follow the Court's orders, to protect them from harm. Not only has Kelly defied and refused to obey the Court's prohibition against having the children around Burke Williamson, an individual the Court deems to be detrimental to the children's best interests, [but] it appears to the Court that Kelly's said failure is due in large part to her perception that there is nothing harmful about having the children around Williamson. Given the exhaustive amount of evidence in the record concerning Williamson, her decisions regarding Williamson and the children seriously call her parental fitness and her mental fitness into question, to the point that the Court deems it necessary to intervene for the sake of the children.

The chancery court also found it "necessary to point out how incredible the Court finds Kelly's testimony to be, in nearly all respects."

¶40.    On appeal, Kelly offers very little in the way of argument on this issue, except to state the clear and convincing burden was not met, and the finding was an "extreme and unjust sanction for contempt." Upon careful review, we find the chancery court's findings that Kelly was immoral and unfit supported by substantial evidence.

¶41.    The court's findings are lengthy and detailed. As pointed out by the chancellor and Craig, Kelly did not lose custody over a few modest indiscretions, but instead by making constant choices that favored her own desires over her children's best interests. Indeed, her relationship with her "soulmate" Burke appears to take precedence over custody of her

22

children. The chancellor was so concerned about Burke's being around the children, he twice enjoined Burke from contact with them. Burke's history includes alcoholism, PTSD, adultery, and disobeying court orders. Burke admitted he has PTSD, he is taking medication for it, and there is no cure. He also admitted to drinking several days a week. The chancellor specifically stated that he found it "necessary to intervene for the sake of the children." The chancellor also found it necessary to threaten Burke with perjury on the stand due to his evasive and obviously untruthful testimony about Kelly's flag photograph and when they started a sexual relationship.

¶42. Kelly's relationship with Burke was not the only reason her natural-parent presumption was rebutted. Importantly, the chancellor noted a pattern of behavior by Kelly of misleading the GAL, Dr. Moore, and the court itself, which was reflected in the record. Her testimony was frequently contradictory about dates, places, and times, although she apparently blames the discrepancies on dyscalculia.

¶43. Kelly's inability to respect and obey the court's directives also points to her lack of morality and fitness as a parent. Kelly defied the court's temporary orders by living with Burke, exposing her children to Burke during visitation, allowing Burke to discipline physically one of her children, and refusing to pay Chad's child-support payments to Craig. Additionally, she was not truthful about whether Chad was making child-support payments.

¶44. Chancellors make third-party custody decisions on a case-by-case basis and have wide discretion in their rulings. We cannot find that the chancellor abused his discretion in

23

awarding legal and physical custody of the Sharff children to Craig because Kelly was found immoral and unfit. Kelly placed her relationship with Burke above all concerns for her children, even though her relationship with Burke was detrimental to her children, and impeded her ability to gain legal and physical custody of them. She further used the money Chad paid her as child support for her own personal expenses. Craig believed she also planned to continue to homeschool the children even though it was found detrimental to their education. Kelly failed to comply with the Pine Grove discharge recommendations. The children's needs and welfare were always placed behind those of Kelly.

## II. Involuntary Dismissal of Chad's Custody-Modification Claims

¶45. Kelly makes the procedural argument that the chancery court's jurisdiction over the Sharff divorce ended when Chad's custody-modification pleadings were involuntarily dismissed due to failure to prosecute. She claims that because Craig lacks standing in the Sharff divorce, no motion for modification survived, and the chancery court lacked grounds and jurisdiction to modify the Sharff action. Additionally, Kelly contends that the record supports collusion between Craig and Chad, who were attempting to deprive Kelly of custody of her four minor children by misuse of the procedural process. We are not persuaded by this argument.

¶46. Initially, Chad filed a petition to join Craig's case "for just adjudication," and requested Craig have custody of the children so as not to separate them. Alternatively, Chad requested he have custody. Approximately ten months later, Chad filed a petition to modify

24

child custody in his own case, requesting legal and physical custody of his two children, since a material change in circumstances had occurred – the Burge divorce proceedings. He also filed a motion to transfer and consolidate his case with Craig's case, since the same evidence would be presented in both cases to determine custody. Likewise, Craig filed a motion to consolidate his case with Chad's case, and before trial began, the cases were consolidated.

¶47. At the conclusion of Craig's and Chad's case-in-chief, Kelly's counsel made an ore tenus motion for the involuntary dismissal of Chad's custody-modification action under Mississippi Rule of Civil Procedure 41(b), because Chad had not presented any evidence at trial to forward his claim.[9] Indeed, Chad had not been physically present during the trial since an initial motions hearing nearly eight months earlier. Accordingly, the chancery court granted Kelly's Rule 41(b) motion to dismiss, denying any relief requested by Chad for custody of his children. However, in the chancellor's opinion, he stated that the Sharff divorce judgment was modified by Craig's grant of custody.

¶48. From this ruling, Kelly argues that the involuntary dismissal of Chad's custody modification in this case makes it "legally impossible" for the chancery court to address a change of custody for the Sharff children from Kelly to Craig. She contends the involuntary dismissal was an adjudication on the merits, and Craig no longer has standing in the Sharff case. Thus, the court lacked jurisdiction to modify the custody in it, and the children must remain in Kelly's custody. We disagree.

---

[9] Rule 41(b) allows for involuntary dismissal for failure to prosecute.

25

¶49. In Professor Deborah Bell's family-law treatise, she states:

> A petition to modify . . . [a] custody . . . order must be filed in the court that issued the decree. As between the parties in the original action, the issuing court's jurisdiction is exclusive, precluding any other court in the state from exercising jurisdiction over the case. . . . However, if an issuing court finds that adjudication in another court would be more efficient, jurisdiction may be transferred to that court.

Deborah H. Bell, *Bell on Mississippi Family Law*, § 18.07(1), at 447 (1st ed. 2005). Mississippi Code Annotated section 93-11-65 (Rev. 2013) allows the chancery court to hear a custody case apart from a divorce action.[10] Here, prior to the modification action filed by Chad, Craig had filed for third-party custody of the Sharff children in this action. According to statute, both actions were filed in the Lamar County Chancery Court, as the Sharff children resided in Lamar County in both actions, which is where custody between the natural parents has already been adjudicated. Chad's modification action and Craig's action are in the same chancery court, but with different cause numbers. Craig requested custody – something the court could grant – and both natural parents were given notice and an opportunity to be heard. The chancery court had the jurisdiction to modify custody of the Sharff children. That

---

[10] Section 93-11-65(1) provides that the chancery court of the proper county has jurisdiction to hear and determine suits for custody of minor children. "Proceedings may be brought by or against a resident or nonresident of the State of Mississippi, whether or not having the actual custody of minor children, for the purpose of judicially determining the legal custody of a child." The action shall be brought in the county where the child is actually residing, or in the county of the residence of the party with actual custody, or in the county of the residence of the defendant. "Process shall be had upon the parties as provided by law . . . ."

jurisdiction was not lost when Chad's petition to modify custody was dismissed.[11] Kelly has not cited any authority to the contrary. This issue is without merit.

## CONCLUSION

¶50. The chancery court did not abuse its discretion in finding Kelly's natural-parent presumption rebutted and in awarding physical and legal custody of the Sharff children to Craig. The chancellor's findings were supported by clear and convincing evidence with the best interests of the children in mind. Further, Kelly's procedural argument is without merit. Accordingly, this Court affirms the judgment of the chancery court granting custody of all four children to Craig.

¶51. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**

---

[11] Even if the action had been filed in a different chancery court, the chancellor could have transferred the action. Here, the actions were merely consolidated as they were already in the same court.