# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01782-COA

**CRYSTAL LAFAYETTE ROBERTS**                                          **APPELLANT**

**v.**

**EZRA CONNER, KRISTINA FARRA AND**                                   **APPELLEES**
**LUCILLE LAFAYETTE**

DATE OF JUDGMENT:                08/12/2019
TRIAL JUDGE:                     HON. ROBERT Q. WHITWELL
COURT FROM WHICH APPEALED:       CALHOUN COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:         JEFFREY BIRL RIMES
                                 SARAH LINDSEY HAMMONS
ATTORNEYS FOR APPELLEES:         KELLY GUNTER WILLIAMS
                                 DAVID L. VALENTINE
NATURE OF THE CASE:              CIVIL - CUSTODY
DISPOSITION:                     AFFIRMED - 06/15/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1.     Randy Lafayette had custody of his daughter, Laura,[1] at the time of his death. After Randy's death, his close friends Ezra and Kristina Farra Conner (the Conners) filed a "petition for emergency temporary custody," which was contested by Laura's natural mother, Crystal Lafayette Roberts. Randy's mother, Lucille Lafayette, joined the Conners in asking the chancery court to award custody of Laura to the Conners instead of Crystal. The Calhoun County Chancery Court found that the Conners overcame the natural parent presumption and

---

[1] A pseudonym is used to protect the identity of the minor child.

awarded custody of Laura to the Conners. Crystal appeals. Finding no error in the chancery court's ruling, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Crystal and Randy were married and had one child, Laura, in December 2007. They separated in 2014. Initially, Crystal was awarded temporary custody of Laura, and she took Laura and her half-brother to live in Florida while Randy remained in Mississippi.

¶3. After Crystal and Randy's separation, Laura began having difficulty in school. When Crystal moved to Florida, she enrolled Laura in first grade for the 2014-2015 school year. Laura repeated the first grade in Florida during the 2015-2016 school year. During the 2015-2016 school year, Laura had twenty-seven unexcused absences, six excused absences, and thirty-seven tardies. Crystal lived in multiple homes with her two children while residing in Florida during the separation including the home of her friend, Carmen Williams. At some point, Crystal lived in an apartment from which she and the children were ultimately evicted.

¶4. Randy sought custody of Laura during the divorce proceedings. Crystal and Randy's divorce was finalized on August 26, 2016. Pursuant to the judgment of divorce, Randy was granted physical custody of Laura, and Crystal was granted certain visitation rights. Crystal returned to Florida, and Laura moved back to Calhoun County, Mississippi, to live with Randy.

¶5. After obtaining custody of Laura, Randy enrolled her in second grade for the 2016-2017 school year; however, she was not allowed to advance to the third grade. Laura repeated the second grade during the 2017-2018 school year and was promoted to the third

2

grade for the 2018-2019 school year. Halfway through Laura's third grade year, on January 1, 2019, Randy unexpectedly died. At the time of Randy's death, Laura was with Crystal.[2]

¶6. Immediately following Randy's death, the Conners and Randy's mother, Lucille Lafayette, filed a petition for emergency temporary custody and permanent custody. The Conners requested emergency temporary custody and permanent custody of Laura and that Crystal be granted visitation rights to be exercised in Mississippi. The Conners alleged that Crystal was unfit to have physical custody. Further, the Conners alleged that because Crystal's new husband, Tim, had a job that required him to travel extensively, and because Crystal traveled with him, it would be an unstable environment for Laura. Finally, the Conners alleged that Laura was behind in her academics when Randy obtained custody, but since she had been in Calhoun City Elementary School, she had been "progressing well and finally catching up her academics." The Conners claimed that Laura would be irreparably harmed if Crystal was allowed to take her outside of Mississippi.

¶7. On the day the petition was filed, the chancery court entered an emergency temporary custody order without a formal hearing and without notice to Crystal, which granted the Conners' request for emergency temporary physical custody of Laura. The chancery court also set a date for a temporary hearing six days later on January 10, 2019. Crystal was served with the emergency custody order on January 4, 2019, at Randy's visitation service, and Laura was taken by deputies and immediately placed in the Conners' custody. The parties

---

[2] Pursuant to Randy and Crystal's 2016 judgment of divorce, Crystal was supposed to return Laura to Randy on December 26, 2018, at the end of her Christmas visitation period with Crystal. However, Crystal still had Laura in Florida on the date that Randy died.

3

entered an agreed order on January 11, 2019, allowing Crystal temporary physical custody of Laura with the understanding that she would continue to reside in Mississippi. The Conners were granted visitation every other week. Further, the temporary agreement ordered that the case would be set for a review hearing at or near the end of the current school year.

¶8. On January 15, 2019, Crystal filed her answer to the Conners' petition as well as a counter-petition for custody of Laura. Crystal claimed there were no circumstances present to overcome the natural parent presumption, and she should retain custody of Laura. She further asserted that the Conners should not be given any custodial or visitation rights with Laura and that they should be ordered to pay the attorney's fees, court costs, and expenses that she incurred in responding to the emergency petition.

¶9. The trial was set for June 11, 2019. However, on that date, instead of the trial, the court granted the Conners' motion to appoint a guardian ad litem (GAL) to "investigate the matters alleged by the parties, so that the GAL may make a report and recommendation . . . as to what would be in the best interest of [Laura]." The custody trial was continued until July 25, 2019.

¶10. Two days prior to trial, Crystal filed a motion for a continuance based on the fact that the GAL did not visit her home in Florida, and she requested that the trial be continued "until such time as the GAL may investigate such living arrangements." Further, she claimed that she would be "prejudiced if this matter is not continued." The parties' attorneys participated in a telephonic pre-trial hearing on Crystal's motion, which the chancellor subsequently denied. The GAL advised the chancery court that "regardless of whether . . . she inspected

4

something in Florida, . . . her opinion would not change in relation to her opinion set forth in the [GAL] report." The court ultimately denied Crystal's motion for continuance.

¶11. The custody trial began on July 25, 2019. At trial, the Conners alleged that they should receive custody of Laura due to Crystal's medical neglect, educational neglect, and Crystal's insufficient housing in Florida. In addition, several witnesses testified that Crystal failed to take care of Laura's personal hygiene and basic needs.

¶12. As to the medical-neglect issue, Crystal admitted that she canceled a surgery that Laura needed. Prior to his death, Randy scheduled a tonsil and adenoid removal surgery for Laura. The record is clear that Crystal cancelled the surgery on the day before it was scheduled to occur. However, Crystal gave differing reasons for her opposition to the surgery. Crystal first asserted that she was afraid that Laura would have an adverse reaction to the anesthesia because of a possible inherited medical condition. However, at trial Crystal testified that she opposed the surgery because Randy failed to consult her before he scheduled it, despite the fact that they shared joint legal custody of Laura. As of the trial date, which was approximately six months after Crystal gained custody of Laura pursuant to the agreed temporary order, the surgery had not been rescheduled, and Laura had not undergone any testing to assess potential allergies to anesthesia. The record reflects that Laura continued to have issues with a sore throat and other adverse side effects as a result of not having the surgery. At trial, the GAL testified that during her investigation she learned that Laura was still having problems with her throat since she still had her tonsils. During this litigation process, Crystal allowed Laura's Mississippi Medicaid coverage to lapse, and

5

she failed to obtain any additional health insurance coverage in either Mississippi or Florida. Laura was not covered under anyone's medical insurance at the time of trial. Ultimately, the GAL opined that Crystal's decision to forgo Laura's surgery and failure to secure insurance constituted medical neglect.

¶13. The Conners also alleged education neglect. After moving to Florida, Crystal enrolled Laura in the first grade for the 2014-2015 school year. Laura repeated the first grade in Florida during the 2015-2016 school year. During the 2015-2016 school year, Laura had twenty-seven unexcused absences, six excused absences, and thirty-seven tardies. The GAL testified that she reviewed Laura's school records and found the same amount of absences. She also testified that Crystal informed her of Laura's possible dyslexia but stated that she had not yet been tested. As a result, the GAL determined that Crystal had also educationally neglected Laura.

¶14. Finally, the Conners alleged that Laura did not have a place to live. At trial, the GAL testified that Crystal was "unfit for failing to provide care necessary for health, morals, and well-being" because "Crystal has really no permanent residence that is acceptable for [Laura] to live." When she first interviewed Crystal, Crystal stated that she was a resident of Florida. The GAL asked Crystal what her address was in Mississippi since she was living in Mississippi at the time, and Crystal responded that she was a Florida resident so it did not matter. The GAL later discovered that Crystal's Florida residence, which she shared with her husband Tim and Laura's half-brother, had recently incurred significant damage due to a hurricane and was infested with black mold. While the GAL did not travel to Florida to

6

view the home, it was undisputed at trial that Tim's mother was the sole owner of the home, and while she continued to live in the one room that was allegedly unaffected by the mold, the remainder of the home was uninhabitable for Crystal and her family. At trial, Tim testified that the home in Florida had black mold due to hurricane damage. Tim and Crystal both confirmed that they were planning to rent a house when they returned to Florida until construction was complete on their home; however, neither the court nor the GAL were provided an address for the rental house.

¶15. As part of her investigation, the GAL visited Crystal's temporary residence in Paris, Mississippi. At the time of trial, there were six people living in Crystal's two-bedroom, one-bathroom home.[3] There was contradicting testimony at trial regarding sleeping arrangements in the home. Crystal testified that Laura had her own bedroom; however, the GAL's report indicated that Laura told the GAL that she slept in a recliner in the living room. Regardless of the condition of Crystal's home in Mississippi, Crystal never wavered in her position that she did not plan to remain in Mississippi and that the family was going to move back to Florida immediately following the custody trial.[4]

¶16. At trial there were multiple witnesses who testified that while in Crystal's care, Laura was forced to wear dirty clothes, smelled badly, and did not regularly bathe or brush her

---

[3] Crystal's seventeen-year-old daughter, Katelyn, and her husband were also living with Crystal, Tim, Laura, and Laura's half-brother at the time of trial. Both Katelyn and Crystal were pregnant at the time. Crystal testified that Katelyn and her husband were only temporarily living with the family.

[4] Crystal also told the GAL that she would be a stay-at-home mom if she received custody of Laura.

teeth. Ezra testified that Crystal had lost Laura's toothbrush at one point and, as a result, she had not brushed her teeth for several days. He also testified that Laura's clothes smelled sour when they would get her from Crystal's home. Laura's best friend's mother, Alicia Havens, testified that when she would hug Laura, she could tell that she had not bathed. According to Alicia, "[Laura's] hair would have an odor, her body would have an odor, her clothes would have an odor . . . [from] a lack of hygiene." Kristina testified that "there were a few times where [Laura's] clothes did smell . . . more of mildew." Several witnesses also testified that Crystal had discontinued Laura's dance lessons and counseling sessions. Alicia testified that her daughter and Laura attended dance classes together prior to Randy's death. According to Alicia, Laura loved dance classes; however, after Randy's death Crystal did not continue to take Laura to the classes. The GAL testified that Laura had been seeing a counselor in Oxford; however, it was her understanding from Laura that Crystal had discontinued the sessions. The GAL testified that it was her opinion that "counseling would be great for any child who's lost a parent for sure. And because of the other upheaval in her life, certainly it would be in her best interest to continue to be able to talk to someone."

¶17. At the conclusion of the trial on July 26, 2019, the chancellor rendered a bench opinion that was incorporated into a judgment entered on August 12, 2019. The judgment stated in part that the Conners were granted permanent custody of Laura and granted Crystal visitation. Further, the judgment reapportioned the GAL fees and ordered that the parties split the remaining balance owed to the GAL and ordered Crystal to reimburse the Conners for the money that they had already paid the GAL.

8

¶18. Aggrieved by the judgment, Crystal raises the following issues on appeal: (1) whether the chancery court erred in denying Crystal's motion for a continuance; (2) whether the chancery court applied the proper legal standard in awarding custody to the Conners on an emergency and permanent basis and whether the court's findings "rose to the level of 'unfitness' as required to remove a child from her natural family"; (3) whether the doctrine of res judicata barred consideration of the facts from Randy and Crystal's prior divorce trial in determining custody in this case; (4) whether the chancery court erred in relying on uncorroborated hearsay in finding Crystal unfit to have custody of Laura, or rather was its finding supported by credible evidence; (5) whether the chancery court erred in imposing geographical restrictions on Crystal's visitation without making any specific findings as to the necessity of those restrictions, especially in light of the fact that Crystal's nuclear family had a permanent residence in Florida; and (6) whether the chancery court properly apportioned the GAL fees between Crystal and the Conners.

**STANDARD OF REVIEW**

¶19. "This Court employs a limited standard of review in child-custody cases and will 'affirm findings of fact by chancellors when they are supported by substantial evidence unless the chancellor abused her discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.'" *Carter v. Carter*, 204 So. 3d 747, 756 (¶37) (Miss. 2016) (quoting *Borden v. Borden*, 167 So. 3d 238, 241 (¶4) (Miss. 2014)). "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). This Court reviews all questions of law de

9

novo. *Townsend v. Townsend*, 859 So. 2d 370, 372 (¶7) (Miss. 2003).

## ANALYSIS

**I.    Whether the chancery court erred in denying Crystal's motion for continuance.**

¶20.    Crystal argues on appeal that the chancery court abused its discretion by denying the motion for a continuance that she filed two days before the trial. More specifically, Crystal claims that by failing to require the GAL to visit her home in Florida, the chancery court limited the scope of the GAL investigation and pertinent evidence was absent at trial. Further, she argues that even if the home visit in Florida would not have changed the GAL's recommendation, it was error for the chancery court to prematurely release the GAL from her duty to investigate and report all material facts both favorable and unfavorable to her recommendation.

¶21.    Whether a motion for continuance is either granted or denied is within the discretion of the trial court. *Kaiser v. Kaiser*, 281 So. 3d 1136, 1144 (¶33) (Miss. Ct. App. 2019). "The only time this Court will overturn the denial for a continuance is when manifest injustice has occurred. Prejudice must result from the denial in order to have that decision reversed." *Henderson v. Henderson*, 952 So. 2d 273, 277 (¶7) (Miss. Ct. App. 2006) (citation omitted).

¶22.    In this case, the GAL only visited Crystal's temporary residence in Paris, Mississippi. Other than Crystal's Mississippi address, the only address that was given to the GAL was an address in Marianna, Florida. During her interviews with both Crystal and Tim, the GAL discovered that the home in Marianna, Florida, was infested with black mold and, as a result of a hurricane, the home was uninhabitable and not a viable housing option for Crystal's

10

family. Further, the GAL was informed that the Marianna home was owned by Tim's mother, and she was living in the only room that was allegedly not affected by the mold. Crystal did not give the GAL any other specific details or addresses for alternate housing in Florida. While Crystal did mention the possibility of renting a home from a friend, she did not provide the GAL with any information regarding that home, nor did she file a notice of change of address with the court pursuant to Rule 8.06 of the Uniform Rules of Chancery Court to indicate that she had obtained an alternate residence.

¶23. Given the uncontested information that the GAL was given during her investigation regarding Crystal's Florida residence, and the lack of specific information regarding any other potential housing options, the GAL advised the chancery court that her custody recommendation would not have been affected by a visit to Florida to investigate what Tim and Crystal had already confirmed. Based on the GAL's representation, the chancery court denied Crystal's motion for a continuance. As a result of the denial of the motion for a continuance, the trial proceeded as scheduled on July 25, 2019. At trial, the condition of the Florida residence was further corroborated by Tim's testimony where he admitted that the home was infested with black mold. Further, Tim testified that purchasing a home was not an option because he and Crystal could not get approved for a loan. Finally, Crystal testified again that they had a home they would be renting in Florida while theirs was under construction; however, there was no other evidence presented at trial to corroborate her testimony. Given the confirmed information that the GAL was given prior to trial, there was simply no further evidence to be discovered by an in-home visit to Florida as there was no

question as to whether black mold was in the home. It was, and that fact was confirmed. Crystal provided absolutely no information concerning viable housing options for Laura in Florida. Further, after receiving the GAL's report prior to trial and hearing the GAL's testimony, Crystal still did not provide any evidence at trial to corroborate her testimony that she was going to rent a house in Florida.

¶24. In *Robinson v. Brown*, 58 So. 3d 38, 42 (¶9) (Miss. Ct. App. 2011), Liz Robinson argued that the chancellor erred in denying her motion for a continuance based on the fact that her ex-husband Paul Brown did not serve his discovery responses until the morning of trial. *Id*. In response, Paul asserted that the attorneys had discussed the discovery responses on the day prior to trial and that there was nothing unexpected in the responses that would have been an unfair surprise to Liz. *Id*. Considering those arguments, this Court held that the record did not reflect any manifest injustice as a result of the denied continuance, nor any prejudice to Liz as a result of the denial. *Id*. at (¶11). As a result, this Court found no error in the denial of Liz's motion for continuance. *Id*.

¶25. Similarly, in this case there was no unfair surprise resulting from the GAL's failure to visit Crystal's Florida residence. All necessary and available information needed for the GAL's recommendation was gathered prior to trial and present in her report which was submitted to all the parties on July 19, 2019, prior to the trial on July 25, 2019. Further, the information contained in the report concerning the Florida residence was confirmed by Tim's trial testimony. Finally, the record does not reflect any prejudice to Crystal as a result of the denial of the motion for continuance. It is important to note that the GAL's custody

12

recommendation was not based solely on Crystal's lack of suitable housing for Laura, but rather on a combination of factors including medical neglect, educational neglect, lack of suitable housing, and testimony that Laura had poor hygiene while in Crystal's care. It is clear that the GAL's recommendation would not have changed even if the housing factor was removed or if the GAL had made the visit to Florida to confirm what Tim admitted and Crystal never denied.

¶26. Crystal also argues that in failing to require the GAL to investigate her Florida residence, the chancery court erred by releasing the GAL from her duty to investigate and report all material facts both favorable and unfavorable to her recommendation. In *S.G. v. D.C.*, 13 So. 3d 269, 282 (¶57) (Miss. 2009), the Mississippi Supreme Court held that

> the [GAL] should make recommendations only after providing the court with all material information which weighs on the issue to be decided by the court, including information which does not support the recommendation. The court must be provided **all material information the [GAL] reviewed** in order to make the recommendation.

(Emphasis added). In this case, the GAL provided all of the material information **that she reviewed** in order to make her recommendation. As previously discussed, there was absolutely no proof of the existence of any additional material information to be gleaned from a visit to Crystal's home in Florida.

¶27. Finally, Crystal failed to offer her own proof of any information could have been discovered by a visit to her Florida residence. She presented no evidence or testimony either before or during trial that proved contradictory to the GAL's original assessment of her housing situation in Florida. In *Scroggins v. Riley*, 758 So. 2d 467, 472 (¶19) (Miss. Ct. App.

13

2000), this Court addressed the lack of proof of discoverable evidence by the complaining party by stating

> Mrs. Scroggins was able to present evidence directly to the chancellor on all of the various aspects that she claims the [GAL] should have investigated in more depth. She offers no reason as to why the [GAL] might have been able to develop additional information critical to the chancellor's decision process that Mrs. Scroggins herself could not obtain.

In this case, Crystal had every opportunity to provide proof of suitable housing directly to the chancery court and yet she failed to do so. Given the lack of proof of the existence of any additional material information regarding Crystal's Florida residence, she suffered no manifest injustice or prejudice by virtue of the denial of her motion for a continuance. Therefore, we find no error in the chancery court's denial of Crystal's motion for a continuance.

> **II. Whether the chancery court applied the proper legal standard in awarding temporary and permanent custody of Laura to the Conners.**

¶28. Crystal argues that the chancery court applied the incorrect legal standard in granting custody to the Conners on an emergency temporary basis and also on a permanent basis. More specifically, Crystal claims that the chancery court applied a "who is better" standard and only considered evidence regarding who could better provide for Laura's needs, rather than making a determination as to whether the Conners provided sufficient proof to support their allegation that Crystal was an unfit parent. Further, Crystal claims that the findings of the chancery court did not "rise to the level of unfitness" required to remove Laura from her custody.

14

### A. Emergency Relief

¶29. For the first time on appeal, Crystal alleges that the chancery court erred in granting the Conners' request for emergency temporary custody of Laura by erroneously applying the "best interest" standard rather than articulating any irreparable harm that could possibly come to Laura if she remained in Crystal's interim custody. In doing so, Crystal argues that the chancery court further erred by failing to give her notice of the emergency hearing. According to Crystal, the emergency temporary order violated her constitutional right to parent her child and travel freely. Crystal argues that the chancery court entered its emergency temporary order not to prevent immediate irreparable harm from coming to Laura but rather based its findings on the Conners' assertions that they could provide a more stable home for Laura. Crystal asserts that the chancery court erred in basing its decision on the fact Crystal traveled frequently with her husband relative to his job, and because she intended to move Laura back to Florida.

¶30. Precedent mandates that this Court may not entertain arguments made for the first time on appeal and a case must be decided on the facts contained in the record and not on assertions in the briefs. *Parker v. Miss. Game & Fish Comm'n*, 555 So. 2d 725, 730 (Miss. 1973). Notwithstanding the procedural bar, Crystal's arguments are without merit. The Mississippi Rules of Civil Procedure provide for emergency injunctive relief without notice to the adverse party in certain circumstances such as this. Rule 65(b) states in part:

> A temporary restraining order may be granted, without notice to the adverse party or his attorney if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss[,] or damage will result to the applicant before the adverse party or his

15

attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and reasons supporting his claim that notice should not be required. . . .

In case a [TRO] is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and take precedence over all matters except older matters of the same character.

"The granting of a TRO is within the discretion of the trial judge, and we will not disturb the order absent an abuse of discretion." *C.M. v. R.D.H. Sr.*, 947 So. 2d 1023, 1027 (¶11) (Miss. Ct. App. 2007). Further, the law does not protect parental rights to the detriment of the best interest of the child. *Davis v. Vaughn*, 126 So. 3d 33, 38 (¶15) (Miss. 2013). "Parental rights, as is true of other fundamental rights, can be forfeited or taken away, and our law does recognize some means by which third parties can overcome the law's preference of natural parents. . . . The law protects the best interests of the child by its recognition that a natural parent's 'liberty interest in the care, custody, and management of their children and families,' is not an absolute right." *Id.* at 38-39 (¶15) (citation omitted).

¶31. The Conners' petition for emergency temporary custody specifically laid the foundation for their argument that irreparable injury would come to Laura if the court denied their petition. Paragraph seven of their petition summarized the difficulties that Laura encountered in school beginning with her first-grade year and indicated that she was finally "catching up" with her academics in her current school in Mississippi. Further, the Conners asserted that Crystal's extensive travel with her husband, Tim, prohibited her from providing a stable environment to Laura. The Conners asserted that it would be detrimental to Laura if she were uprooted from her known and established life in Mississippi and moved to

Florida. Finally, the Conners alleged that they would provide additional reasons at trial as to Crystal's unfitness and present proof that the court's failure to grant their emergency petition would present a high risk of irreparable harm to Laura.

¶32. Additionally, the Conners' petition stated their reasons for not serving Crystal with the emergency petition. They feared that Crystal would "abscond" with Laura if she were served with normal process. Their petition stated that given Crystal's history of keeping Laura from Randy during his periods of custody and preventing Randy's family from visiting with Laura after his death and before his funeral, they feared that she would take Laura to Florida. In fact, they argued that Crystal was withholding custody of Laura at the time of Randy's death in violation of the divorce judgment and that Crystal had refused to allow Laura to visit with her paternal grandmother immediately following Randy's death or during the family's time of grieving.

¶33. The chancellor found that the Conners' petition for emergency relief satisfied all of the elements required by Rule 65(b). The petition contained both the allegations of irreparable harm and the reason that they were asking for relief without notice to Crystal. The chancery court granted the request for emergency relief without a hearing and the motion was set for a hearing that was scheduled for six days later. Prior to the hearing, the parties reached a temporary agreement wherein Crystal maintained temporary custody of Laura. We find that the chancery court did not abuse its discretion by granting the Conners' request for temporary emergency custody without notice.

### B. Permanent Relief

17

¶34. Crystal alleges that the chancery court made the decision to permanently remove Laura from her custody based on an "erroneous interpretation of the law." She asserts that the chancery court awarded custody to the Conners based on their ability to better provide for Laura rather than making a determination as to whether the Conners provided sufficient proof to overcome the natural parent presumption.

¶35. "In custody battles between a natural parent and a third party, it is presumed that it is in the child's best interest to remain with his or her natural parent." *Smith v. Smith*, 97 So. 3d 43, 46 (¶8) (Miss. 2012). However, "the natural parent presumption can be rebutted by a clear showing that (1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; or (4) the parent is **unfit,** mentally or otherwise, to have custody." *Id*. at (¶9) (emphasis added). Absent a showing by clear and convincing evidence that the natural parent has abandoned the child or is otherwise unfit, the natural parent will prevail in a third-party custody contest. *McCraw v. Buchanan*, 10 So. 3d 979, 984 (¶15) (Miss. Ct. App. 2009). A finding of unfitness is necessary before the court can decide the best interest of the child. *Id*.

¶36. After the trial in this case on July 26, 2019, the chancery court gave an extensive bench ruling which was reduced to a written judgment and entered on August 12, 2019. In his oral ruling, the chancellor was very thorough in his recitation of the law and the legal standard governing this case. The chancellor quoted multiple cases in his six-page explanation of the general appropriateness of the applicability of the natural parent presumption and the proof required to rebut that presumption. In his ruling, the chancellor

stated in part:

> The evidence presented throughout this matter **has not indicated abandonment** on the part of [Crystal]. . . . However, there's been a shocking amount of testimony and other evidence presented to show **medical and educational neglect** by [Crystal] and that [she] has made poor life decisions affecting her child. . . . Furthermore, [Crystal] is otherwise **unfit** as she has failed to provide [Laura] with the care that's necessary for her health, morals and well-being. [Crystal] has no permanent residence that's appropriate for the child. . . . [Crystal] has demonstrated a lack of thoughtful maturity and responsibility requisite to the proper upbringing of the child, rendering her quite **unfit** to be granted physical custody of [Laura].

(Emphasis added). The chancery court's ruling on the record left no doubt it determined that Crystal was unfit, and based on that determination alone, the burden had been met to overcome the natural parent presumption. There is no indication from the record that the chancery court relied on an erroneous "best interest" legal standard in awarding custody to the Conners. Rather, the court relied on the applicable law and, more specifically, the final prong of the test set forth in *Smith*, 97 So. 3d at 46 (¶9), in finding that the natural parent presumption was rebutted and that Crystal was unfit to have custody of Laura.

¶37. Now it is necessary to evaluate whether the chancery court erred when it made factual determinations that the natural parent presumption was rebutted due to Crystal being "unfit" in four respects: (1) educational neglect; (2) medical neglect; (3) failure to provide Laura with appropriate housing; and (4) Crystal's inability to provide for Laura's basic needs.

### 1. Educational Neglect

¶38. The chancery court based its finding of educational neglect on the evidence and

19

testimony presented at trial that Laura had to repeat both first and second grade;[5] that Crystal failed to get Laura a tutor to assist with her school work; that Crystal failed to have Laura tested for dyslexia; and that Laura had an excessive number of absences while in Crystal's custody prior to the divorce. It was undisputed that Laura was two years behind in school at the time Randy obtained physical custody of Laura. It was further undisputed that Laura did not have a tutor to assist her with her school work. Crystal testified that she inquired about a tutor through Laura's school; however, the school did not have the resources to provide a tutor, and Crystal looked no further to obtain tutoring services. Crystal's husband, Tim, testified he believed that Laura may have dyslexia based on his personal experience with the learning disability. Despite the belief that Laura may suffer from dyslexia, Crystal testified that she had not had Laura tested. Finally, according to the GAL's report and the school records, Laura had twenty-seven unexcused absences, six excused absences, and thirty-seven tardies during the 2015-2016 school year while in Crystal's custody. At trial, the GAL testified that she had not reviewed Laura's most recent attendance record as part of her investigation but opined that her investigation revealed educational neglect.

### 2. Medical Neglect

¶39. The chancellor based his finding of medical neglect on the evidence and testimony presented at trial that Crystal had cancelled Laura's tonsil and adenoid surgery and failed to reschedule the surgery in her six-month period of custody prior to trial. Crystal testified at

---

[5] The Conners' brief states that Laura had to repeat both first and second grade while she was in Crystal's custody; however, the record indicates that she repeated her first-grade year while in Crystal's custody and her second-grade year while she was in Randy's custody.

trial that she called the doctor's office on the day before the scheduled surgery. She advised the office that she had just been notified of the surgery and that she was concerned that there could be complications related to the anesthesia due to a hereditary allergy. However, at trial Crystal testified that she was opposed to Laura having the surgery because Randy had not consulted with her about it despite the fact that she and Randy had joint legal custody. Crystal admitted that she had not had Laura tested for any possible allergies associated with anesthesia since she cancelled the surgery. Finally, Crystal testified that she had not renewed Laura's Mississippi Medicaid coverage or obtained medical insurance for Laura in Florida. On the date of trial, Laura was not covered under any health insurance plan and still had not had a surgery found necessary by a medical doctor. The GAL confirmed Crystal's cancellation of the surgery, her failure to reschedule it, and her failure to fill out paperwork to ensure that Laura obtained health insurance. Consequently, the GAL opined that her investigation revealed Crystal's medical neglect of Laura.

### 3. Inadequate Housing

¶40. An additional consideration of the chancery court was the fact that Crystal did not have suitable housing for Laura in Florida in the event that she was granted custody. Crystal made it very clear to the GAL and the chancery court that she intended to move back to Florida after the custody trial. Tim and Crystal advised the GAL that their permanent residence in Florida was uninhabitable after sustaining damage from a hurricane nine months prior. As a result of the damage, the home was infested with black mold. At trial, Tim confirmed the presence of black mold in the house in Florida. Crystal and Tim testified that

21

they could possibly rent a home in Florida; however, they had not yet signed a lease and they provided no additional information about the alleged rental home. Finally, Tim testified that he was unable to get approval for a loan due to his bad credit. He indicated that purchasing a home was not an option at the time of trial. Providing a home and a safe and stable environment for a child is certainly one of the factors included within whether a person is fit to be a parent. In *N.E. v. L.H.*, 761 So. 2d 956, 967 (¶34) (Miss. Ct. App. 2000), this Court stated:

> [A]ny decision reached with respect to the placement of [a] minor child should be soundly supported by the facts of the case, keeping in mind what is in the best interest of the minor child, when making its findings of fact and conclusions of law. Further inquiry and additional investigation into the child's special needs, **living conditions**, family environments and particular circumstances affecting the two parties as pertains to the best interest of the minor child on remand would greatly benefit the lower court in rendering a decision.

(Emphasis added). There is substantial and sufficient proof in the record to support the chancery court's factual determination as to a lack of housing for Laura if Crystal was given permanent custody.

### 4. Crystal's Inability to Provide for Laura's Basic Needs

¶41. Finally, the chancery court considered the evidence and testimony that Crystal failed to take care of Laura's personal hygiene and basic needs. At trial, Laura's best friend's mother, Alicia Havens, testified that when she would hug Laura, she could tell that she had not bathed. According to Alicia, "[Laura's] hair would have an odor, her body would have an odor, her clothes would have an odor . . . [from] a lack of hygiene." Alicia also testified that Laura loved dance classes before Randy's death and afterwards Crystal would not take

22

Laura to them. Further, Alicia explained to the court that Crystal would not let Laura be around her best friend after Randy's death and the girls could not grieve together due to Crystal's actions. Further, the GAL reported that Laura was no longer allowed to attend counseling sessions with Pat Ward as she had been doing. Crystal testified at trial that she had taken Laura to one counseling session immediately prior to trial but she provided no evidence of any additional counseling sessions. Kristina testified at trial that "there were a few times where [Laura's] clothes did smell. It was more of mildew." Crystal's friend, Carmen Russell, testified on the behalf of the Conners at trial that Crystal and Laura lived with her and her family in Florida in 2014 after Crystal's separation from Randy but prior to the divorce being final. Carmen testified that during the time that Crystal lived with her, she took care of Crystal's kids, cooked for the children and cleaned the house while Crystal was involved in a romantic relationship with their next-door neighbor.

¶42. In *White v. Thompson*, 569 So. 2d 1181, 1184 (Miss. 1990), the Mississippi Supreme Court held that while the chancellor may have erred in relying predominately on White's lesbian relationship in finding her unfit, "[t]here was credible evidence . . . that the **children had not been properly supervised**, and that they had **not been adequately clothed or fed** . . . ." (Emphasis added). Further, the supreme court upheld the chancery court's ruling that the paternal grandparents were granted custody instead of the biological parents. *Id*. at 1185.

¶43. In this case, the chancery court was provided overwhelming evidence of neglect and evidence of Crystal's unfitness based on not one or even two areas, but four: (1) educational neglect, (2) medical neglect, (3) inadequate housing, and (4) failure to provide Laura with

23

basic needs such as hygiene. Therefore, we find no abuse of discretion by the chancery court in finding that the natural parent presumption was successfully rebutted as a result of Crystal being determined to be unfit.

> **III. Whether the chancery court was barred by the doctrine of res judicata from considering the facts from Randy and Crystal's prior divorce trial in determining custody in this case.**

¶44. Crystal asserts the doctrine of res judicata precluded the chancery court from considering Laura's 2014-2016 school records and all matters preceding Crystal and Randy's divorce judgment in making its latest custody determination. There is no dispute that the GAL reviewed Laura's 2014-2016 school records and referenced them in her report. The chancery court considered the same school records in making its determination of educational neglect.

¶45. This Court addressed this exact issue in *Powell v. Powell*, 976 So. 2d 358, 363 (¶21) (Miss. Ct. App. 2008). Richard Powell argued that the chancellor erred in considering testimony regarding the family's pre-divorce relocations at a subsequent trial on his motion for modification of custody. *Id*. at (¶19). This Court found "no error in the chancellor's limited consideration of the family's pre-divorce moves." *Id*. at (¶22). This court relied on *Smith v. Todd*, 464 So. 2d 1155, 1157 (Miss. 1985), where the Mississippi Supreme Court stated that

> [i]n considering modification of child custody, the chancellor must allow full and complete proof with respect to all circumstances and conditions directly or indirectly related to the care and custody of the children, existing at the time of the original divorce decree and at the time of the modification hearing.

¶46. In this case, there were allegations that Crystal neglected Laura's education. It was

24

undisputed that Laura struggled in school prior to the divorce when she was living with Crystal. The dispute is not as to the accuracy of that statement but whether the records and testimony proving that statement should have been allowed into evidence at all. When the chancellor's chief concern is to determine the "best interest of the child" when faced with child custody issues, limiting otherwise relevant evidence only because it was already considered by a previous court in a previous proceeding could potentially frustrate the very goal the court is trying to accomplish—determining the best interest of the child.

¶47. Further, even if we found for the sake of argument that the court erred by allowing the school records prior to the divorce into evidence, there was ample testimony to prove that Laura was still educationally neglected. For instance, there was testimony at trial that when Laura was living with Randy, she was doing better in school and beginning to "catch up." Further, there was testimony that since the divorce, Crystal failed to provide Laura with a tutor and she suspected that Laura was dyslexic but neglected to have her tested. Much like the case in *Powell*, it was appropriate for the chancery court to consider evidence prior to Randy and Crystal's divorce for the limited purpose of determining whether Laura had been educationally neglected. It is also important to note that the chancery court found that Crystal was "unfit" based on more than just educational neglect. Therefore, we find no abuse of discretion by the chancery court in considering Laura's 2014-2016 school records in determining that Laura had been educationally neglected in Crystal's custody.

IV.     **Whether the chancery court erred in relying on "mistaken facts" and uncorroborated hearsay in finding Crystal unfit to have custody of Laura, or rather was the court's finding supported by credible evidence.**

25

¶48. Crystal alleges that the chancery court relied on "mistaken facts" and uncorroborated hearsay in determining that she was unfit to have custody of Laura. Crystal first alleges that the chancery court relied on the mistaken fact that Laura failed two grades while in Crystal's custody in making the determination that she was educationally neglected. Crystal further alleges that she attempted to get Laura tutoring, helped her with her homework, and continued to take her to counseling. Crystal also asserts that Laura was not medically neglected. To the contrary, Crystal argues that she was always attentive to Laura's medical needs and that her reasons for canceling Laura's tonsil and adenoid surgery were justified. Crystal claims that the lapse in Laura's healthcare was caused by the unanticipated continuance of the custody trial and that she intended to apply for healthcare in Florida immediately following the trial. Finally, Crystal alleges that "the GAL offered no substantive evidence upon which the Court could rely to adopt her findings," and that the chancery court relied on the GAL's report in its decision to remove Laura from her custody. More specifically, Crystal alleges that the GAL's report was replete with "rank hearsay" and therefore should not be have been used as substantive evidence.

¶49. This Court does not need to "re-examine all of the evidence to see if it agrees with the chancellor's ruling; rather, the appellate court's duty is merely to see if the chancellor's ruling is supported by credible evidence." *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004). In *Butler v. Mozingo*, 287 So. 3d 980, 983 (¶10) (Miss. Ct. App. 2019), this Court stated that "[s]o long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, this

26

Court may not intercede simply to substitute our collective opinion for that of the chancellor." In this case the chancellor relied on the testimony of multiple witnesses and substantial evidence presented at trial in rendering his opinion on custody.

¶50. In regard to the allegations of educational neglect, Crystal is correct that Laura's school records indicated that Laura only repeated one grade while in her custody. However, this factor was only one of several that led the chancery court to the end result that Laura was educationally neglected. Crystal testified at trial that she had inquired about a tutor for Laura in Florida but that tutoring was handled through the school. She could not recall whether a tutor had been provided for Laura. The testimony that Laura did not have a tutor in Mississippi was uncontradicted by Crystal. Crystal testified that she helped Laura with her homework and spelling tests; however, her husband Tim contradicted her testimony. Tim testified that Crystal traveled frequently with him for his work and for her doctor's appointments. Tim stated that if Laura had been in school when he and Crystal were traveling, Laura was left with Crystal's mother. Further, Crystal testified that she had taken Laura to one counseling session immediately prior to the trial date. She did not testify that she had taken Laura to any additional counseling sessions. Crystal's testimony is consistent with the GAL's report that at the time of her interview with Laura, her counseling sessions had been discontinued.

¶51. As for the allegations of medical neglect, the chancery court's decision was based primarily on the fact that Crystal cancelled Laura's tonsil and adenoid removal surgery and failed to have it rescheduled during her six-month period of pre-trial custody. Notably, Laura

27

continued to suffer from the side effects from not having the surgery. Further, Crystal allowed Laura's health insurance to lapse prior to trial. Regardless of Crystal's reasoning for these two actions, the testimony was undisputed at trial that Laura had not undergone the recommended surgery and she did not have health insurance.

¶52. Finally, the GAL's report and recommendation was corroborated by witness testimony at trial to substantiate the chancery court's ruling. Tim and Crystal both testified that they had not secured a suitable residence in Florida in anticipation of their return after trial. There was contradictory testimony between the GAL report and Crystal's trial testimony regarding the sleeping arrangements in Crystal's home in Mississippi. The GAL report stated that Laura said she slept in a recliner in the living room, but Crystal testified that Laura had her own room. Regardless of this discrepancy, Crystal testified that she intended to move back to Florida after the trial. Yet, in Florida, it was undisputed that black mold infested the only available home for Crystal to bring Laura to live.

¶53. Alicia Havens testified that Laura often had a bad odor and lacked proper hygiene while she was in Crystal's custody. Kristina also testified that Laura smelled like mildew when she returned from Crystal's custody. Alicia further testified that Crystal discontinued Laura's dance lessons after Randy's death despite her understanding that they would be free of charge and Laura loved to attend those lessons. Carmen Williams testified that she had to care for Laura and her half-brother while Crystal and the kids were living with her in Florida. Carmen testified that Crystal appeared more interested in her romantic relationship with the next-door neighbor than taking care of her kids' needs at that time.

28

¶54.    The chancery court heard testimony from multiple witnesses who described layers of neglect.  There was substantial credible evidence to support the finding that Crystal was unfit to have custody of Laura.  Outside of the mistaken fact that Laura failed just one school grade while in Crystal's custody and the contradictory testimony about the sleeping arrangements in Crystal's Mississippi home, all of the other allegations of Crystal's unfitness contained in the GAL report were substantiated by witness testimony at trial.  Notably, much of the trial testimony came from Crystal herself.  Therefore, Crystal's argument that the chancery court based its findings on mistaken facts and uncorroborated hearsay is without merit.

> **V.    Whether the chancery court erred in imposing geographical restrictions on Crystal's visitation without making any specific findings as to the necessity of those restrictions, especially in light of the fact that Crystal's nuclear family had a permanent residence in Florida.**

¶55.    Crystal argues that the chancery court erred in finding that she could only exercise her visitation of Laura in Mississippi without making any specific findings as to the necessity of the restriction.  Crystal argues that the court further erred in restricting her visitation considering that Crystal, Tim, and Laura's siblings were all permanent residents of Florida.

¶56.    Chancellors have broad discretion regarding the appropriateness of visitation. *Porter v. Porter*, 766 So. 2d 55, 58 (¶13) (Miss. Ct. App. 2000).  "Both parents must be allowed an opportunity to maintain a healthy relationship with their child.  Restrictions on visitation can be placed if they are necessary to avoid harm to the child." *Id*. (citation omitted).  In *Lacey v. Lacey*, 822 So. 2d 1132, 1137 (¶19) (Miss. Ct. App. 2002), this Court stated

When the chancellor determines visitation, he must keep the best interest of the child as his paramount concern while always being attentive to the rights of the non-custodial parent, recognizing the need to maintain a healthy, loving relationship between the non-custodial parent and the child.

"The chancery court has the power to restrict visitation in circumstances which present an appreciable danger of hazard cognizable in our law. Restrictions placed on visitation are within the sound discretion of the chancellor." *R.L.N. v. C.P.N.*, 931 So. 2d 620, 626 (¶24) (Miss. Ct. App. 2005) (citation omitted).

¶57. In this case, the judgment awarding custody stated in part that Crystal was "granted reasonable rights of visitation with the minor child, [Laura], in the state of Mississippi, as may be agreed upon by the parties." It is clear from the record that Crystal had no suitable residence to exercise visitation in Florida. Her permanent residence in Florida was infested with black mold and uninhabitable for Crystal's family. The record also reflects that Crystal's family lived in Mississippi, and in fact, Tim testified that Laura would often stay with Crystal's mother when Crystal was out of town. Given the fact that the court was provided no evidence of suitable housing in Florida, and Crystal has family living in Mississippi with whom she can stay when exercising visitation, we find no error in the chancery court's finding that Crystal's visitation should be exercised in Mississippi to prevent any harm from coming to Laura

VI. **Whether the chancery court properly apportioned the GAL fees between Crystal and the Conners.**

¶58. Crystal argues on appeal that the chancery court erred in its re-apportionment of GAL fees for three reasons: (1) the chancellor took up the issue of re-assessing GAL fees without

notice to Crystal, (2) the GAL fees were not reasonable because she failed to discharge her duties in her role as the GAL and properly investigate, and (3) the chancellor erred in identifying Crystal as the "non-prevailing" party.

¶59. "Our rules of procedure treat guardian ad litem fees as court costs to be awarded against the non-prevailing party." *Miss. Dep't of Human Servs. v. Murr*, 797 So. 2d 818, 821 (¶9) (Miss. 2000) (citing M.R.C.P. 17(d); *S.C.R. v. F.W.K.*, 748 So. 2d 693, 703 (¶52) (Miss. 1999) (not an abuse of discretion to tax non-prevailing party with costs including guardian ad litem fees); *Lowrey v. Forrest Cnty. Bd. of Supervisors*, 559 So. 2d 1029, 1031 (Miss. 1990); *In re Newsom*, 536 So. 2d 1, 2 (Miss. 1988)). Further, Rule 17(d) states in part:

> In all cases in which a guardian ad litem is required, the court must ascertain a reasonable fee or compensation to be allowed and paid to such guardian ad litem for his service rendered in such cause, to be taxed as a part of the cost in such action.

¶60. While Crystal argues that she had no notice that the original GAL deposit was an issue to be heard on the date of trial, her own answer and counter-petition requested that the court order the Conners to be responsible for her "reasonable attorney's fee, **court costs**, and expenses incurred in defending against the Counter-Respondent's Petition." (Emphasis added). Because the GAL's fees are considered court costs, it should come as no surprise that the issue of all fees, court costs, and expenses would be ruled upon on the trial date. We find no error in the chancery court's decision to re-apportion the GAL fees.

## CONCLUSION

¶61. After review of the record, we find no error in the chancery court's decision finding that the natural parent presumption had been rebutted. We also find that there was substantial

evidence for the chancellor's determination that Crystal was unfit at the time of the trial to have custody of Laura. Further, we find no error in the chancery court's re-apportionment of the GAL fees. Therefore, we affirm the chancery court's judgment.

¶62. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., NOT PARTICIPATING.**